# WILLIAM HUNTER

*v.*

# ISAAC HATCH.

1. DECREE — *can only bear six per cent interest.* This court has repeatedly decided, that a decree can only bear six per cent interest under the law of this State.

2. SAME — *must be reversed before it can be modified.* It is the practice of this court, that, before a decree can be modified, the erroneous portion at least must be reversed. · After reversal, this court may modify it, or remand it with instructions.

3. MORTGAGE — *when transaction between parties will be deemed a mortgage.* Where between A and B the relation of debtor and creditor existed, evidenced by a certain bond of A, and they entered into an agreement, whereby the former conveyed to the latter certain lands to secure the payment of his indebtedness to B, and B executed a bond to C for the reconveyance of them to him, upon the payment of a sum specified in the bond, and surrendered the old bond to A, although it was well understood that C was not to pay any thing on such purchase, the intention being simply to change the form of the security, — *held,* that C took nothing by his purchase, but simply received the equitable title, in trust for A, and that as between A and B the relation of mortgagor and mortgagee existed, and that equity would decree a reconveyance of the lands to A upon his paying to B the amount his due.

4. USURY — *cannot be avoided by substitution of securities.* Nor will such substitution of security, by taking up the old bond, and A executing a deed of the premises to B upon his giving to C a new bond for their reconveyance to him, so change the transaction, as to purge it of any usurious taint with which the original one may have stood charged; the proof, showing that this substitution of security was designed only to give a new form to the old transaction.

5. SAME — *equity will regard the substance, not the form, of such agreements.* When the original securities were tainted with usury, the substitution of others will not remove the taint, such substitution having been made as a cover to usury between parties knowing to the transaction; and it must fail, as equity regards the substance, not the form, of contracts made to avoid the usury laws.

6. STATUTES — *act of* 1867 — *prohibiting application of usurious interest in payment of principal — void.* Under the law as it existed prior to the act of 1867, all payments of usury were treated as payments on the principal when required by the debtor, and so far as the act of 1867 seeks to abrogate this right it is void.

7. LEGISLATURE—*no power to abrogate or transfer a vested right.* It is beyond the power of the legislature to abrogate a vested right, or transfer it to another, other than the one in whom it has lodged.

APPEAL from the Circuit Court of Kane county; the Hon. ISAAC G. WILSON, Judge, presiding.

This was a bill in chancery filed by the appellant in the court below, against the appellee, to redeem certain premises theretofore quitclaimed by him and his wife to appellee; appellant claiming, that such conveyance was made for the purpose of securing the payment of a certain indebtedness of appellant to appellee. The further facts in the case necessary to its understanding, are fully presented in the opinion.

Mr. EUGENE CANFIELD, for the appellant.

Mr. CHARLES WHEATON, for the appellee.

Mr. JUSTICE WALKER delivered the opinion of the Court:

This decree must be reversed, because by its terms appellant is required to pay ten per cent interest on the sum found by the decree to appellee, from the date of its rendition till the money shall be paid. *Pearsons* v. *Hamilton*, 1 Scam. 415; *White* v. *Haffaker*, 27 Ill. 349. The rule is so firmly fixed, by these cases, that a decree can only bear six per cent under our law, that we regard it wholly unnecessary to again discuss the question, and shall content ourselves by reversing the decree because it is violative of the rule distinctly announced in those cases. Appellee's counsel misapprehends the practice when he urges, that this court can modify a decree without first reversing it. After a decree is reversed, then the court may modify it by a decree in this court, or by remanding it with instructions. But, before it can be modified, the erroneous portion, at least, must be reversed.

It appears from the evidence, that appellant was in possession of the pieces of land in controversy before they were sold by the general government. Being unable to raise the money otherwise, he procured its entry in the names of Brady, Peck

and Buck, who were to hold the title as a security for the money they advanced to enter them, until it should be paid with interest by appellant, according to the several agreements then made. Afterward, being unable to pay them without borrowing the money, he applied to and procured it of Daniel S. Gray, and, upon paying Brady, Peck and Buck, they conveyed the land to Gray to hold as a security for the money thus loaned. He afterward effected a similar loan from Benjamin Hackney and paid Gray, who then conveyed the lands to Hackney to hold as a security for the money thus advanced. That in the year 1855, appellant owed Hackney $446.51, and he borrowed that sum from appellee to pay Hackney, and the land was conveyed to appellee to hold as security. Appellant at the time also owed appellee $300 for goods, and $220 for money loaned.

Appellant at the same time purchased a tract containing forty acres of one Moshier for $1,000, as the purchase money, which was paid by appellant, and the land conveyed to him. It was agreed that appellee should convey the premises deeded to him by Hackney and also the forty-acre tract sold by him to appellant, when the latter should pay him $1,966.51, the aggregate amount of the several items of indebtedness; on the amount advanced to Hackney he was to receive twelve per cent, and on the balance fifteen per cent.

It is alleged, that, in October, 1867, appellee gave to appellant a bond for the conveyance of the land upon payment of $4,005, by installments, the last falling due in October, 1861. That this sum was made up by compounding at the rate of twelve per cent on the Hackney loans, and in the same manner at the rate of fifteen per cent on the balance. That several payments were afterward made on the bond, and appellant owed appellee about $500 for goods sold him by appellant.

That in October, 1859, appellee computed the amount due on the bond, with $281 he had paid to Mrs. Gates in November, 1854, compounding interest at the rate of fifteen per cent to be $3,300, after deducting payments made by appellant. That it was then agreed, that appellant and wife should quit-

claim the lands to appellee, and that he should execute a bond
for the conveyance of the lands to Martin P. Allen, a son-in-law
of appellant; the old bond to be given up; Allen to pay the
$3,300 by the 1st of October, 1865, with ten per cent interest,
payable annually, and receive a deed for the lands.   That this
agreement was then entered into, and the new bond given, and
the old one surrendered to appellant, and the quitclaim deed
was executed.

That Allen paid nothing on the purchase of the lands, but
simply received the equitable title to hold as a trustee for
appellant.   That subsequent to this arrangement several pay-
ments were made, amounting to a little more than $1,100.   The
bill charges that appellant had paid over $2,000 of usurious
interest.   He charges that Allen assigned the bond to him on
the 20th of October, 1862, and that he had been continuously
in possession of the land since before its entry, and that he has
made improvements thereon worth the sum of $2,000 or
upward.   Appellant offers to bring whatever sum of money
may be found due upon the contract into court, and prays
that the court will enforce a specific performance of the agree-
ment.

The answer admits that the indebtedness to appellee occur-
red substantially as stated in the bill; that it was to draw
interest at twelve and fifteen per cent per annum, as alleged;
admits the agreement entered into with Allen, as charged, and
that the sum then found to be due was ascertained by comput-
ing interest at those rates on the principal and including the
accounts for goods and the money paid Mrs. Gates; he denies
that appellant has made any payments since giving the bond to
Allen, but alleges they were made by Allen; that appellant
and wife executed the quitclaim deed of the lands to appellee,
as a payment of appellant's indebtedness to him; denies that
Allen was a trustee for appellant in the transaction; that all
but two of the payments on the bond were made by Thomas
Hunter, who claimed to have purchased of Allen; he denies
the assignment of the bond to appellant by Allen; he denies
that he is liable to convey the land under the bond; and alleges

that the land has sometimes been in the possession of the appellant, of Allen and of Hunter.

After hearing the evidence in the court below, the chancellor found, that appellant was bound to perform the agreement on the payment of the amount due upon the contract; that he was entitled to redeem, and stated the account and found due to him $3,940.50, and decreed its payment into court within sixty days. It was decreed that appellee should execute a conveyance and deposit it with the clerk within the same time.

From the time appellee received the title to the land from Hackney and Moshier until the bond was given to Allen, no one can or will contend that the relation of the parties was anything but debtor and creditor, and the creditor holding the title to these lands to secure the payment of the indebtedness. It has been uniformly held, that when the parties occupy such a relation, equity — disregarding form, and looking alone to the substance of all transactions — will regard such as the present to be that of mortgagor and mortgagee. In equity, up to that time, it is manifest, beyond all cavil, that, had appellant paid the money actually due, a court of equity would have compelled appellee to convey the lands to him.

It stands confessed that the sum agreed to be paid by Allen was largely tainted with usury. But is insisted, that taking up the bond held by appellant and giving the new one to Allen, together with the execution of the quitclaim deed, changed the entire transaction, and the vicious agreement previously existing became thereby purified of all usurious taint. Both Allen and Andrew Hunter testify that Allen paid nothing to appellant, or any one else, for the benefit of the contract, or to become the purchaser, but that the bond was made to him for the benefit of, and as a trustee for, appellant, with the knowledge of appellee. We do not see that in equity this changed the transaction in the slightest degree, except in mere form. If this change in the form was intended as a device to cover usury, it must fail, as courts of equity regard the substance and not the form of agreements assumed to evade the usury laws.

It does not appear that appellee intended to give up his farm. On the contrary, he was struggling to retain it. And appellee, as Hunter, the son, testifies, repeatedly assured appellant, to induce him to execute the quitclaim deed and enter into the arrangement, that Allen could at any time assign the bond to him when it suited their convenience. There is nothing in the evidence which indicates that any one of the parties had the slightest impression that Allen was really purchasing or that appellant was selling the land. They all seem to have understood it to be only giving a new form to the old transaction. Allen gave no obligation, nor did he incur any liability for the sum due on the mortgage.

It then follows that the relation of the parties to the transaction was not in equity changed from its previous condition. After appellant received the assignment, appellee was under precisely the same obligation to perform his agreement and permit a redemption as he was before the bond was given to Allen. He held as trustee for appellant, and, had it not been given, appellant could unquestionably have redeemed; and appellee cannot now refuse to permit a redemption on fair and equitable terms.

It then remains to inquire what are the terms upon which appellant shall be permitted to redeem. The act of 28th of February, 1867 (Session Laws, p. 81), declares, that, when the defense of usury is insisted upon in all contracts entered into while the interest law of January, 1849, was in force, and before the adoption of the interest law of January, 1857, and such defense shall be proved, the creditor shall forfeit the excess of interest over the rate which it was lawful for the parties to have agreed upon and reserved in writing, but shall forfeit no more; and no portion of the interest voluntarily paid shall be credited on the principal. The act of 1849 authorized the parties to contract in writing for the payment of ten per cent per annum. It therefore follows, that under the act of 1867 there can be no forfeiture of interest when the defense of usury is interposed to contracts entered into prior to the act of 1857 and subsequent to the act of 1849, unless it exceeds ten per

cent, and only then for the excess over that rate. If this loan was made prior to the adoption of the act of 1857, and after the adoption of the act of 1849, appellant should pay, to redeem, the principal, with ten per cent, allowing credits as in other cases.

The act of 1867 declares, that the sum over ten per cent voluntarily paid by the debtor, shall not be deducted from the principal. Under the law as it existed prior to the passage of this act, all payments of usury were treated as payments on the principal still remaining unpaid, when insisted upon by the debtor. The law so appropriated it, and it was a vested right of the debtor to have it thus applied. It is beyond the legislative power to abrogate a vested right or to transfer it to another person. 'The legislature were therefore powerless to declare, that all money paid over and above ten per cent, under the act of 1849, should not be applied as a payment of the remaining principal.

Appellee made this loan to appellant in 1855, and hence it was under the law of 1849, and falls within the first clause of the act of 1867. Nor did the giving the new bond and taking up the old one, in 1859, change the contract or alter the rights of the parties in this, any more than it did in other respects. This transaction therefore falls within and must be governed by the provisions of the law of 1867.

The decree of the court below is reversed, and the cause is remanded, with directions to refer it to the master to state an account. And, in stating it, he will allow appellee the amount of the principal loaned, as well as any sum appellant was indebted to him, with ten per cent interest; allowing appellant for all sums paid by him and Allen, and if such payments exceed the interest due at the time of payment, computing at the rate of ten per cent, the balance of such payment over and above the amount of interest then due, shall be applied as a credit on the principal, the balance of which principal shall form a new principal upon which to compute interest until the next payment, which, if it shall exceed the interest, shall first satisfy the interest due when made, and the balance to be

applied as a payment on the principal. If, however, the interest shall exceed the payment when made, interest to be computed on the principal until the aggregate payments shall exceed the interest, when the interest shall be extinguished and the balance applied to pay principal. The interest to be first paid, but not to draw interest. The balance which shall remain after so applying all of the payments will be the sum required to redeem.

*Decree reversed.*