(No. 10962.—Judgment affirmed.)

WILLIAM DOROTHY, Trustee, Defendant in Error, *vs.* THE COMMONWEALTH COMMERCIAL COMPANY *et al.* Plaintiffs in Error.

*Opinion filed April 19, 1917—Rehearing denied June 7, 1917.*

1. CONTRACTS—*when contract to purchase accounts receivable evidences a loan and not a sale.* Where a piano company enters into a contract with a commercial company for the assignment to the latter of accounts receivable, the commercial company paying the face value of the accounts less certain graduated percentages, which accounts the piano company must re-purchase at their face value if unpaid at maturity, collections being continued by the piano company as before the contract, the contract must be considered as evidencing a loan with the accounts as collateral security and not a sale of the accounts. (*Mercantile Trust Co.* v. *Kastor,* 273 Ill. 332, followed.)

2. USURY—*when rule that usurious interest, voluntarily paid, cannot be recovered back does not apply.* The rule that usurious interest, when voluntarily paid, cannot be recovered back does not apply where successive loans at usurious rates are made upon assignments of accounts receivable as collateral, the borrower being given credit for partial settlement of previous loans when each succeeding loan and assignment is made, as such action is, in effect, a renewal of the previous loans, and so long as the original debt remains unpaid the debtor may insist upon the deduction of the usurious interest from the beginning of the transactions.

3. SAME—*section 11 of Interest act does not prevent debtor corporation from insisting on deduction of usury.* Section 11 of the Interest act, providing that no corporation shall interpose the de-

fense of usury in any action, does not allow a debtor corporation to insist upon the forfeiture of all interest where it has contracted to pay usurious interest, but under such section the debtor corporation may insist that only interest at the legal rate shall be allowed in determining the amount due the creditor.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. DENIS E. SULLIVAN, Judge, presiding.

ZANE, MORSE & McKINNEY, (FRANKLIN HESS, of counsel,) for plaintiffs in error.

FRED H. ATWOOD, CHARLES O. LOUCKS, and VERNON R. LOUCKS, for defendant in error.

Mr. JUSTICE COOKE delivered the opinion of the court:

The facts in this case are similar to those involved in *Mercantile Trust Co.* v. *Kastor,* 273 Ill. 332. On and prior to July 22, 1908, the R. K. Maynard Piano Company (hereinafter referred to as the Maynard Company) was engaged in the manufacture and sale of pianos in the city of Chicago. On July 22, 1908, the Maynard Company entered into a contract with the Commonwealth Commercial Company (hereinafter referred to as the Commonwealth Company) as follows:

"Articles of agreement made and entered into at Chicago, Illinois, this twenty-second day of July, A. D. 1908, by and between R. K. Maynard Piano Company, hereinafter designated as first party, and the Commonwealth Commercial Company, an Illinois corporation, hereinafter designated as second party.

"*Witnesseth,* that whereas first party is now engaged in the business of manufacturing pianos at Chicago, Illinois, and has, owns and is possessed of accounts receivable evidencing shipments and deliveries of goods usually dealt in

by said first party, which said accounts receivable are owing and will be due to said first party, and which accounts receivable, and any others to be hereafter created, said first party desires to sell to said second party, and said second party is desirous of purchasing same upon the terms, provisions and conditions hereinafter stated:

"Now, therefore, in consideration of the premises and the sum of one dollar and other good and valuable considerations each to the other in hand paid, the receipt whereof is hereby acknowledged, the parties hereto have agreed and do hereby agree as follows:

"*First*—First party agrees to sell, and second party agrees to buy, accounts receivable which may be acceptable to second party, and second party agrees to pay therefor the face value of accounts, less one per cent on accounts paid within fifteen days, two per cent on accounts paid within thirty days, three per cent on accounts paid within sixty days, four per cent on accounts paid within ninety days, five per cent on accounts paid within one hundred twenty days, six per cent on accounts paid within one hundred fifty days, seven per cent on accounts paid within one hundred eighty days; subject, however, to the terms and conditions of this agreement or any other writing executed between said parties at any time hereafter, said payment to be made by second party as follows: Seventy-eight per cent on thirty day accounts, seventy-seven per cent on sixty day accounts, seventy-six per cent on ninety day accounts, seventy-five per cent on one hundred twenty day accounts, seventy-four per cent on one hundred fifty day accounts, seventy-three per cent on one hundred eighty day accounts, upon receipt of such accounts duly assigned to second party and the acceptance of such accounts by second party, the remainder, less the discount, as aforesaid, and any and all deductions and discounts taken by the debtor, to be paid to first party upon payment in full of any account, provided, however, that no payment of the remainder shall be

made while any of the accounts sold as aforesaid shall be in default.

"*Second*—It is further agreed that first party shall assign to second party all right, title and interest in and to the accounts so purchased by second party, and that upon delivery of same second party shall control and be alone entitled to receive all moneys due and owing on any account so purchased, but that said second party assumes no responsibility, beyond the exercise of due diligence and ordinary business judgment, in the acceptance of checks or other forms of exchange in payment of the accounts acquired by it from first party, and that said accounts so owned by second party shall not be considered as having been paid until said second party actually receives the face value thereof.

"*Third*—First party does hereby make, constitute and appoint J. E. Bayrd or J. G. M. Glessner, or any person whom either or both may designate, the true and lawful attorney of first party, and does hereby authorize said attorney or his substitute to indorse the name of said first party upon any checks or other forms of exchange that may come into the possession of second party as payment upon or on account of said accounts so purchased by it from first party, or to indorse the name of first party on. any freight or express bill or bill of lading relating to said accounts, hereby ratifying and confirming any and all acts of said attorney in this behalf.

"*Fourth*—First party, in further consideration of the premises, does hereby guarantee payment of all accounts, as aforesaid, to second party according to the terms indicated and appearing on said accounts, and first party hereby waives notice of default or non-payment of all accounts, and agrees that second party may grant one or more extensions to any or all parties liable on said accounts.

"*Fifth*—It is agreed that in the event of non-payment, at maturity, of any accounts purchased, as aforesaid, by

reason of the insolvency of the debtors or otherwise, second party is given the right and option, without notice to first party, to apply any moneys in its hands or that may thereafter come into its possession, belonging to first party, in settlement and discharge of such accounts so in default at maturity, for reasons in this paragraph stated. It is understood and agreed that the term 'insolvency,' as used in this contract, shall be defined to mean the inability, refusal or failure of debtor to pay the debt at maturity, or the suspension of business, or any other act of the debtor constituting a business failure.

"*Sixth*—First party agrees not to sell or tender for sale to second party any account unless full and complete deliveries shall have been made pursuant to any agreement, representation or understanding had between first party and the debtors named in said account, or concerning which there is any difference or dispute in relation to the quality, quantity or consideration of said debt, but that each and every of said accounts shall be for a certain, definite, undisputable, liquidated claim or demand and which is not yet due. It is further agreed that immediately upon the execution and delivery to second party of an assignment of the right, title and interest of first party in and to the accounts so purchased, as aforesaid, second party shall be and become vested with all the rights theretofore belonging to first party in and to said accounts, including the right of first party to exercise the right of stoppage in transitu upon any shipment of merchandise evidenced by said accounts that may then be in transit. It is further agreed that in the event of failure or refusal of debtor to retain said merchandise, title to such merchandise shall revert to and remain in second party until such account is fully paid. It is further agreed that second party shall have and is hereby given the right and privilege to inspect the books, accounts and records of first party relating to the accounts, as aforesaid, at any time; that immediately upon the con-

summation of the purchase by second party of the accounts, as aforesaid, first party shall make a suitable and proper entry upon the books of first party, disclosing the absolute sale of said accounts to second party.

"*Seventh*—First party further agrees that in the event of non-payment of any account purchased by second party at maturity thereof or in the event of insolvency of debtor named in such account, first party agrees to re-purchase from second party, within five days from the date of insolvency or default, as aforesaid, and to pay therefor the same amount paid to first party by second party for or on account of such account plus the discount as provided for in the first paragraph of this contract, with interest at the rate of six per cent per annum from date of insolvency or date of maturity of such account, as the case may be; and first party expressly agrees that in the event of the failure or refusal of debtor, for any reason whatever, to pay to second party the whole amount due upon any account so purchased, as aforesaid, and the failure of first party to re-purchase from second party, within the time aforesaid, the account so in default, as aforesaid, second party is hereby authorized to institute such legal proceedings as in its judgment may be necessary and proper to enforce payment of such account in default, and first party expressly agrees to pay all costs and attorney's fees which may be incurred in this behalf.

"*Eighth*—It is further agreed that the provisions of this contract relating to the purchase of accounts, as provided in paragraph 1 of this contract, shall be and become obligatory upon the parties hereto for the period of twelve months from and after the date first above written, but that all other provisions contained in this contract shall be and remain in full force and effect until all accounts so purchased, as hereinbefore provided, shall be fully paid, settled and discharged.

"*Ninth*—It is agreed that the purchase of accounts, as aforesaid, and the payment of the consideration therefor, is made upon the representations in writing concerning the financial responsibility of first party, evidenced by the written statement or statements made by first party to second party from time to time.

"*Tenth*—First party agrees to execute and deliver to second party, on request therefor, any document necessary or proper to carry into effect the terms, provisions and conditions of this contract.

"*Eleventh*—It is understood that neither of the parties hereto shall be bound by anything not expressed in writing by and between the parties hereto, except as specified in the fourth paragraph.

"In witness whereof," etc.

Attached to this contract was the following guaranty, which was signed by R. K. Maynard, who was then president of the Maynard Company:

"For and in consideration of the sum of one ($1) dollar paid by the Commonwealth Commercial Company to the undersigned, receipt of which is hereby acknowledged, the undersigned hereby guarantees to the Commonwealth Commercial Company the full, prompt and faithful payment, performance and discharge by R. K. Maynard Piano Company of each and every one of the agreements, provisions and conditions as set forth in lines 1 to 113, inclusive, of the foregoing contract, and also all agreements, provisions and conditions of any rider hereto attached when said rider bears the signature of the undersigned, and also the agreements, provisions and conditions of any other written instrument executed by said R. K. Maynard Piano Company which is necessary to carry out the provisions of this contract provided to be done, paid or discharged by R. K. Maynard Piano Company in the manner and form as therein provided. The undersigned hereby waives all notice of default by said R. K. Maynard Piano Company

and notice of acceptance of this guarantee by the Commonwealth Commercial Company.

"In witness whereof we, or either of us, have hereunto set our hand and seal this twenty-second day of July, A. D. 1908."

Thereafter, on September 7, 1909, and on September 7, 1910, contracts between the Maynard Company and the Commonwealth Company in exactly the same form and containing the same provisions as the one above set out were executed, each covering a period of one year from its date. On September 7, 1911, the same parties entered into another contract, which, while similar in form to the prior contracts, differed from them in the following respects: It provided that the Maynard Company should sell, and the Commonwealth Company should buy, accounts receivable at their face value, less "one-half of one per cent on accounts paid within fifteen days, one per cent on accounts paid within thirty days, two per cent on accounts paid within sixty days, three per cent on accounts paid within ninety days, four per cent on accounts paid within one hundred twenty days, five per cent on accounts paid within one hundred fifty days, six per cent on accounts paid within one hundred eighty days; subject, however, to the terms and conditions of this agreement or any other writing executed between said parties at any time hereafter; said payment to be made by second party as follows: Seventy-nine per cent on thirty day accounts, seventy-eight per cent on sixty day accounts, seventy-seven per cent on ninety day accounts, seventy-six per cent on one hundred twenty day accounts, seventy-five per cent on one hundred fifty day accounts, seventy-four per cent on one hundred eighty day accounts." The guaranty attached to this contract was signed by R. K. Maynard and S. M. Wessel, the latter being the treasurer of the Maynard Company. The following rider was attached to the contract of September 7, 1911:

"It is agreed by first party that accounts receivable which are evidenced by notes, contracts or chattel mortgages covering the sales of pianos by the first party to its customers upon monthly or installment payments shall be paid in full within twelve months from the date of purchase by second party, and payments within such time are guaranteed by first party. It is further agreed by the parties hereto that all such accounts receivable purchased by second party shall be purchased for eighty-seven per cent (87%) of their face value,—that is to say, at a discount of thirteen per cent (13%); that sixty-seven per cent (67%) of the face value of such accounts shall be paid to first party by second party when the accounts are assigned and delivered, and the remaining twenty per cent (20%) shall be paid to first party by second party when such accounts are fully collected by second party, together with the credits (if any) hereinafter provided for. On all cash receipts or collections by second party from such accounts receivable, whether in full payment or in partial payment of such accounts or installments thereof, credits shall be given to first party as follows: On all cash received within thirty days from the date of purchase a credit of eleven per cent of the amount collected. If received after thirty days and within sixty days, a credit of ten per cent. If received after sixty days and within ninety days, a credit of nine per cent. If received after ninety days and within four months, a credit of eight per cent. If received after four months and within five months, a credit of seven per cent. If received after five months and within six months, a credit of six per cent. If received after six months and within seven months, a credit of five per cent. If received after seven months and within eight months, a credit of four per cent. If received after eight months and within nine months, a credit of three per cent. If received after nine months and within ten months, a credit of two per cent. If received after ten months and within eleven

months, a credit of one per cent. If received after eleven months and within twelve months no credit shall be given."

Contemporaneously with the execution of each of the above contracts another contract was made, the first year between the Commonwealth Company and R. K. Maynard and in the subsequent years between the Commonwealth Company and S. M. Wessel. These contracts were all identical in form. That executed in 1910 was as follows:

"Memorandum of agreement made and entered into this twenty-third day of September, A. D. 1910, by and between the Commonwealth Commercial Company, party of the first part, and S. M. Wessel, party of the second part.

"*Witnesseth,* that whereas said first party has, contemporaneously herewith, entered into a contract with R. K. Maynard Piano Company, hereinafter called the client, wherein and whereby said client has agreed to sell, and said first party has agreed to buy, certain of the current accounts receivable, choses in action and contracts for the sale of merchandise and property of like character of said client; and whereas, said party of the first part will from time to time purchase and acquire certain of such accounts receivable, choses in action and contracts of said client and will require the services of some person for the collection of the same for the account of said first party; and whereas, said second party has signified his willingness to act as the agent of said first party in the collection for said first party of such accounts receivable, choses in action and contracts of said client as said first party may hereafter from time to time purchase and acquire from said client:

"Now, therefore, in consideration of the premises and of the compensation herein agreed to be paid by said first party to said second party, the parties hereto have agreed and do hereby agree with each other as follows:

"*First*—Said second party is hereby made, constituted and appointed the agent of said first party, and hereby agrees to accept said employment and act as such agent for

the collection for said first party of such accounts receivable, choses in action and contracts of said client as said first party may from time to time hereafter purchase and acquire under said aforementioned agreement from said client and agrees to promptly collect the same; and said second party further agrees that he will from time to time, as and when collected, pay and deliver to said first party all moneys, checks, drafts, money orders or other evidences of indebtedness which he may receive, as such agent, in the collection of said accounts receivable, choses in action and contracts acquired by said first party, and that the same, as and when received, shall be received by said second party in trust for said first party.

"*Second*—Said second party further agrees that he will keep all moneys collected by him, as such agent, from debtors of said client whose accounts are acquired by said first party separate and apart from his own funds and the funds of said client, and will keep a separate, full and correct account of all moneys, checks, drafts, money orders and other evidences of indebtedness received by him from such debtors, which said account shall at all times be subject to the inspection of said first party, and that he will from time to time, when requested, render a full, true and correct statement to said first party of all moneys, checks, drafts, money orders or other evidences of indebtedness collected by him, as such agent, from said debtors.

"*Third*—Said second party further agrees that he will not extend the time of payment of any such accounts receivable, choses in action or contracts of any debtors whose accounts receivable, choses in action or contracts are acquired by said first party, and that he will accept in payment thereof only money, checks, drafts, money orders or other evidences of indebtedness, (except notes or time paper,) and that all requests by such debtors for the extension of the time of payment of any of such accounts receivable, choses in action or contracts, or for deductions, or

allowance of any credits or other allowances thereon, shall be referred to first party for its written approval.

"*Fourth*—Said second party shall be paid by said first party, and shall receive and accept in full payment of all compensation for the services to be rendered by second party hereunder and in lieu of all other charges or expenses of said second party in making said collections, the sum of one dollar per year out of funds other than those collected by said second party hereunder.

"*Fifth*—Said contract of employment shall continue in force until all of the accounts receivable, choses in action and contracts of said client acquired by said first party shall have been collected in full, unless said contract of employment shall be sooner terminated, at the election of first party, by notice in writing to said second party, or by the written resignation of said second party delivered to said first party, it being expressly understood and agreed that said first party may at any time, at its election, cancel this agreement and terminate the agency of said second party hereunder.

"*Sixth*—It is expressly understood and agreed that said second party shall not have the right to retain or apply any of the moneys, checks, drafts, money orders or other evidences of indebtedness received by him from the debtors whose accounts are acquired by said first party in payment of any moneys due or to become due from said first party to said second party hereunder, or to said client, or otherwise, but the whole of any such moneys, checks, drafts, money orders and other evidences of indebtedness shall be paid and delivered by said second party to said first party from time to time, as and when requested, as hereinbefore provided."

In the transaction of its business the Maynard Company sold pianos to dealers upon four months' credit, with a discount of five per cent if the account was paid within thirty days. It also, through agents, sold pianos upon the install-

ment plan, making contracts with the purchasers of pianos which provided for payment of the purchase price in installments extending over periods varying from twenty to thirty months. In operating under the contracts with the Commonwealth Company, the Maynard Company, as it desired to obtain money from the Commonwealth Company upon accounts or piano contracts, executed and delivered to the Commonwealth Company assignments in the following form:

"This is to certify that the persons named below are indebted to the undersigned in the sums set opposite their respectives names, for goods sold and delivered. [Then followed the list of names and amounts.] And in consideration of one dollar and other good and valuable considerations, the receipt of which is hereby acknowledged, the undersigned hereby sells, assigns and transfers to the Commonwealth Commercial Company, its successors and assigns, all right, title and interest in and to the contracts and open accounts above named, including all moneys due and to become due upon the same and the goods covered by or described therein. The undersigned guarantees that the balances due on said contracts and open accounts are correctly set out in the above schedule thereof, and that full deliveries have been made on said contracts and open accounts in accordance with the specifications of the buyer, and that the amounts due on said claims, as set out in said schedule, are not disputed by the debtor, are not past due, that there are no set-offs (claimed) against said accounts, or any of them, for freight, drayage or other carrying charges, commissions, damages or any other counter-claims of any nature whatsoever, but that the amount set out in each item of said schedule is net. In consideration of the premises aforesaid the undersigned hereby guarantees the payment in full to the Commonwealth Commercial Company of said balances due or hereafter to become due on said contracts and open accounts, as indicated in said above

278 — 41

schedule, in accordance with the tenor of said contracts and open accounts, and hereby waives notice of any default or delay in payments."

The assignments were dated and were signed by the Maynard Company.

The contracts and accounts were always offered to the Commonwealth Company in lots, each lot being given a serial number, the insertion of a lot of accounts or contracts in the form of the assignment just set out being referred to as listing the accounts or contracts therein described. The accounts were invariably listed as four months accounts,— that is, when open accounts were assigned the Commonwealth Company discounted the face of the accounts five per cent while the first three contracts were in force and four per cent while the last contract was in force, and, after deducting the twenty per cent reserved by the Commonwealth Company in accordance with the terms of the contracts, paid to the Maynard Company the remaining seventy-five per cent or seventy-six per cent. Subsequently, in the course of collecting accounts, if the debtor paid his account within thirty days, thereby becoming entitled to the discount of five per cent allowed by the Maynard Company, the amount of this discount was charged to the Maynard Company and was deducted from the twenty per cent reserve retained by the Commonwealth Company, and if the debtor did not pay the account within four months the Commonwealth Company either re-assigned the account to the Maynard Company at its face value or charged the Maynard Company an additional discount of one per cent per month until the account was paid.

During the time the Maynard Company transacted business with the Commonwealth Company under the contracts above mentioned the Maynard Company assigned to the Commonwealth Company 112 lots or lists of accounts and piano contracts, the face value of which aggregated $523,512.73. More than two-thirds of this amount repre-

sented piano contracts which were assigned. These piano contracts were listed for one year,—that is, upon their assignment the Commonwealth Company discounted the face value of the contracts thirteen per cent, and, after deducting the twenty per cent reserved by it, paid to the Maynard Company sixty-seven per cent of the face value of the contracts. As before stated, these piano contracts provided for the payment of a certain sum in installments, the payments extending over a period of from twenty to thirty months, the unpaid installments bearing interest, usually at the rate of six per cent per annum. When interest was received on the piano contracts the Commonwealth Company credited the Maynard Company with the amount so received and accounted to the Maynard Company therefor in settlements made between the two companies. When the twelve months period for which these piano contracts had been listed expired the Maynard Company was obliged to take up such of them as had not been paid in full, at their then face value. They could then be re-listed for another year and re-assigned to the Commonwealth Company in accordance with the terms of the contract then in force between the two companies,—that is, the Commonwealth Company would again discount the face value of the contracts thirteen per cent, and, after deducting the twenty per cent reserved by the Commonwealth Company, would pay to the Maynard Company sixty-seven per cent of the face value of the contracts. The record shows that at least 289 of these contracts, after having been discounted by the Commonwealth Company, were taken up by the Maynard Company at the end of the discount period at their face value and were then re-listed and re-assigned to the Commonwealth Company and again discounted by that company in accordance with the provisions of the contract under which the assignment was made, and that the operation was again repeated as to at least 176 of the contracts.

The Commonwealth Company did not collect any of the accounts or installments upon piano contracts assigned to it by the Maynard Company. All of them were collected through the office of the Maynard Company at the expense of the Maynard Company, and the amounts so collected were by Maynard or Wessel, acting under the agency contracts between them and the Commonwealth Company, then turned over to the Commonwealth Company. All communications sent to the debtors with reference to their accounts and contracts were sent by and at the expense of the Maynard Company, and the debtors were never advised of the assignments or of the fact that the Commonwealth Company had any interest in their accounts or contracts. At times the Commonwealth Company took an audit of the accounts held by it by sending letters to the debtors containing statements of their accounts and requesting verification of such statements, which letters were signed by the Maynard Company and were accompanied by return envelopes addressed to a box number in the Chicago post-office rented by the Commonwealth Company, the purpose of this arrangement being to conceal from the debtors the fact that their contracts or accounts had been assigned to the Commonwealth Company. In order to conceal from the banks from which the Maynard Company was borrowing money the fact that the Maynard Company was transacting business with it, the Commonwealth Company used cashier's checks instead of its own checks in making payments to the Maynard Company upon contracts and accounts assigned to it.

On May 10, 1912, the Maynard Company was adjudged a bankrupt by the United States district court for the northern district of Illinois upon the petition of certain of its creditors. Thereafter, on July 11, 1912, William Dorothy, as trustee in bankruptcy of the Maynard Company, filed his bill of complaint in the superior court of Cook county against the Commonwealth Company and

the Northern Trust Company, alleging that the transactions between the Commonwealth Company and the Maynard Company by which the Commonwealth Company purported to purchase from the Maynard Company accounts and piano contracts, were, in fact, mere loans of money by the Commonwealth Company to the Maynard Company at usurious rates of interest, and that the accounts and piano contracts assigned to the Commonwealth Company were not, in fact, sold to that company but were assigned to it as collateral security for the money so loaned by the Commonwealth Company to the Maynard Company. The bill alleges, and the proof shows, that of the accounts and piano contracts assigned to the Commonwealth Company from July 22, 1908, to the time of the filing of the petition in bankruptcy, those remaining unpaid and claimed by the Commonwealth Company were of the aggregate face value of $73,655.58; that on July 15, 1910, the Commonwealth Company entered into an agreement with the Northern Trust Company by which the latter company agreed to act as trustee and holder of certain accounts receivable which should be assigned to it by the Commonwealth Company and to hold the same as security for certain notes to be issued by the Commonwealth Company, and that under said agreement all of the accounts and piano contracts assigned by the Maynard Company to the Commonwealth Company have been assigned, transferred and turned over to the Northern Trust Company as trustee and are now in its possession and under its control. The bill further alleges that interest at the rate of five per cent per annum on all moneys advanced by the Commonwealth Company to the Maynard Company for the time the same was so advanced during the entire period from July 22, 1908, to July 12, 1912, amounts to $11,791.45, and that the total amount charged by the Commonwealth Company to the Maynard Company during the period from July 22, 1908, to April 25, 1912, in the form of discounts, is $44,044.74,

which amount the bill charges is $32,253.51 over and above the legal rate of interest during that period. The bill further charges that the balance due the Commonwealth Company on all moneys advanced by it from July 22, 1908, to the date of filing the bill of complaint, including interest at the legal rate of five per cent per annum, is $20,542.67, which sum has been tendered to both the Commonwealth Company and the Northern Trust Company, and that upon the payment of said amount the trustee in bankruptcy is entitled to the possession of the said accounts and piano contracts now in the hands of the Northern Trust Company; that the Commonwealth Company and the Northern Trust Company claim that they are entitled to the sum of $51,125.34 on said accounts and piano contracts and refuse to surrender possession thereof to the trustee in bankruptcy until said sum is paid to them, and that after the Maynard Company had been adjudged a bankrupt the Commonwealth Company sent out to the parties whose accounts and contracts it held, notices advising said parties that the Commonwealth Company held their contracts and warning them not to pay money to anyone who could not produce their contracts. The bill prays that an account may be had of the amount due from the trustee in bankruptcy to the Commonwealth Company, and that upon payment of the sum of $20,542.67, or such amount as may be found due by the court, the Commonwealth Company and the Northern Trust Company may be ordered to turn over and deliver to the trustee in bankruptcy the said accounts and contracts and all papers now in their possession relating to the same. The Commonwealth Company and the Northern Trust Company answered the bill, alleging that the Commonwealth Company is a corporation organized under the laws of Illinois, and has power under its charter, among other things, to engage in the business of purchasing accounts and obligations owing to mercantile houses and others but has no power or authority, under its charter, to

loan money, and that the transactions between the Commonwealth Company and the Maynard Company were not loans but were *bona fide* sales of accounts and piano contracts by the Maynard Company to the Commonwealth Company. After hearing the evidence the court dismissed the bill for want of equity. The trustee in bankruptcy prosecuted an appeal to the Appellate Court for the First District, and the Appellate Court, upon the authority of *Mercantile Trust Co.* v. *Kastor, supra,* reversed the decree and remanded the cause to the superior court for further proceedings. A writ of *certiorari* having been granted by this court upon the petition of the Commonwealth Company and the Northern Trust Company, the record has been brought here for review.

The negotiations leading up to the making of the first contract between the Maynard Company and the Commonwealth Company were conducted by R. K. Maynard, president of the Maynard Company, and John E. Bayrd, president of the Commonwealth Company. Maynard testified that his original purpose in applying to the Commonwealth Company for money was to obtain a loan upon the accounts and contracts as collateral security, but that Bayrd informed him early in the negotiations that the Commonwealth Company did not loan money,—that it only purchased accounts upon the terms thereafter embraced in the contract of July 22, 1908; and Maynard, Bayrd and Wessel all testified that there was no secret understanding as to the nature of the transactions between the Maynard Company and the Commonwealth Company but that the written contracts between those companies correctly set forth the intentions of the parties, and that the terms and provisions of those written contracts were strictly adhered to in all transactions between the companies with reference to accounts and piano contracts.

We have set out the various contracts entered into between the two companies fully in order to afford a full

understanding of the situation in view of the contentions made by the Commonwealth Company. That company contends that the *Kastor case, supra,* is not conclusive for two reasons: (1) It is clearly distinguishable; and (2) it is against all authority and should be overruled.

There is no essential difference between the contracts in this case and the contract in the *Kastor case, supra,* so far as their construction is concerned, as to whether they evidence sales or loans for which accounts and piano contracts were pledged as security. The conduct of the parties to the contracts indicates conclusively that they regarded the transactions as loans and not as sales. When the president of the Maynard Company opened negotiations with the Commonwealth Company to secure the money his company needed in its business, he exhibited piano contracts, many of them installment contracts which would not mature for twenty and thirty months after date, as the sort of contracts which would figure in the deal. Thereafter, under the contracts entered into, many of these installment piano contracts which could not possibly, under their terms, mature within one year, were among the contracts which the Commonwealth Company purported to purchase from the Maynard Company. Although upon their face these installment contracts did not mature for two years or more, it is claimed the Maynard Company made a *bona fide* sale of them, with the guaranty that it would re-purchase them if they were not paid within one year. This indicated that the parties did not regard the contracts as evidencing sales. It is suggested that this deduction is wrong because the purchasers in the piano installment contracts had the privilege of pre-payment, which might be, and was, in fact, in many cases, exercised within the year, and that a majority of those who did not exercise their privilege were in default at the time of the purported re-purchase by the Maynard Company at the end of the one-year period. Even if it be conceded that the parties knew, at the time the money

was advanced and the long-time installment contracts were turned over, that a portion of them would be paid during the one-year period and the remainder would be defaulted, the transaction would still indicate a loan, with the installment contracts pledged as security, and not a sale. If it was known at the time the money was advanced that any of the installment contracts listed would be defaulted within the year, then the transaction amounted merely to a loan, with the Maynard Company obligated to return the amount advanced, with interest. In other respects the actions of the parties indicated that they regarded the transactions between them as loans and not as sales of piano contracts and accounts. For instance, if an account or piano contract which was discounted for four months or for a year was paid in one month it was treated as a one-month account and adjusted accordingly in the settlement between the two companies. On the other hand, if a four-months account ran over four months it was adjusted on the advanced basis, thus indicating that it was the intention that the Maynard Company should be charged for money loaned to it for the time it used the money. The testimony of the officers of the two companies, when analyzed, discloses that it was the true intent of the parties that the Maynard Company should borrow, and the Commonwealth Company should lend, the money advanced from time to time, and that the scheme whereby this was effected was a mere shift and device to cover up the real nature of the transaction.

Counsel for the Commonwealth Company have argued the questions raised exhaustively, but we are not persuaded that the decision in *Mercantile Trust Co.* v. *Kastor, supra,* is wrong and we adhere to it. Our views were fully stated in that opinion and it is unnecessary to repeat them here. For the reasons there given we hold that the contracts in question were not agreements for the sale of accounts and piano contracts but were agreements for loans at usurious

rates of interest by the Commonwealth Company to the
Maynard Company upon the pledge of the latter's accounts
and piano contracts. No contention is made that the situ-
'ation is affected by the assignment of the pledged piano
contracts and accounts to the Northern Trust Company by
the Commonwealth Company or that any right of the trust
company is involved.

Of the 112 lots of accounts and piano contracts assigned
by the Maynard Company to the Commonwealth Company
there remained in the hands of the Commonwealth Com-
pany, or in the hands of the Northern Trust Company as
trustee, at the time the Maynard Company was adjudged a
bankrupt, accounts and piano contracts included in 37 lots.
The remaining 75 lots had been closed on the books of the
Commonwealth Company as completed transactions. The
Appellate Court in its opinion found that the dealings be-
tween the Maynard Company and the Commonwealth Com-
pany constituted one continuous transaction, and, in effect,
directed the superior court, in determining the amount due
from defendant in error to the Commonwealth Company,
to ascertain the various sums of money loaned by the Com-
monwealth Company to the Maynard Company and to com-
pute interest thereon at the legal rate of five per cent per
annum for the respective periods during which the May-
nard Company had the use of the same. Plaintiffs in error
insist that in making this finding and direction the Appel-
late Court erred because the proof shows that 75 of the 112
transactions had been closed before the Maynard Company
was adjudged a bankrupt, and that the law is well settled
in this State that when usurious interest has been volun-
tarily paid by the debtor it cannot be recovered back in a
suit brought therefor, nor can it be set off against any de-
mand in favor of the creditor other than the debt upon
which the usurious interest has been paid. The rule of law
upon which the plaintiffs in error rely is not applicable to
the facts in this case. The evidence shows that while 75

of the transactions by which lots of piano contracts and accounts were assigned to the Commonwealth Company were, according to the books of that company, closed and completed, many of them, when considered as loans, were not completed when closed on the books of the Commonwealth Company, but, on the contrary, became a part of the 37 transactions which were not closed at the time the Maynard Company was adjudged a bankrupt. As an illustration, lot 13 consisted of piano contracts of the face value of $4981.90, assigned to the Commonwealth Company on January 16, 1909, as collateral security for a loan of $3337.87. Lot 14 consisted of piano contracts of the face value of $6192.44, assigned to the Commonwealth Company on January 28, 1909, as collateral security for a loan of $4148.93. On June 28, 1910, the Maynard Company assigned to the Commonwealth Company lot 36, consisting of piano contracts of the face value of $9210.73, upon which the Commonwealth Company loaned to the Maynard Company $917.93 in cash and applied $2250.89 in extinguishment of the balance due from the Maynard Company on account of the loan made on lot 13 and $3002 in extinguishment of the balance due from the Maynard Company on account of the loan made on lot 14. On June 28, 1911, the Maynard Company assigned to the Commonwealth Company lot 65, consisting of piano contracts of the face value of $7375.86, upon which the Commonwealth Company loaned to the Maynard Company $1235.09 in cash and credited the Maynard Company with the remaining $3706.74 in order to close lot 36 on the books of the Commonwealth Company. Lot 65 is one of the 37 lots which had not been closed at the time the Maynard Company was adjudged a bankrupt. It is apparent that while lots 13, 14 and 36 were closed on the books of the Commonwealth Company, the transaction by which lot 36 was assigned to the Commonwealth Company amounted to a renewal of $2250.89 of the $3337.87 loan made on Novem-

ber 25, 1908, and to a renewal of $3002 of the $4148.93 loan made on January 28, 1909, and the loan of an additional $917.93, with other security substituted therefor, and that the transaction by which lot 65 was assigned to the Commonwealth Company amounted to a renewal of $3706.74 of the indebtedness secured by the assignment of lot 36, and therefore, necessarily, to a renewal of portions of the indebtedness secured by the assignments of lots 13 and 14. The same situation exists as to many of the lots subsequent to lot 14 which were closed on the books of the Commonwealth Company prior to the bankruptcy proceedings. As to those lots that were assigned prior to the assignment of lot 13, the testimony of the president of the Commonwealth Company shows that during the early part of the transactions between the parties, when the period for which lots had been assigned expired, instead of deducting the amount necessary to take up the old lots from the proceeds of a new lot, as was subsequently done, the Commonwealth Company gave to the Maynard Company a check for the full amount of the proceeds of a new lot, and the Maynard Company in turn gave to the Commonwealth Company a check for the amount necessary to take up an old lot which had matured. This transaction was no different, in effect, from the one in which, instead of passing checks, the Commonwealth Company, upon the assignment of a new lot of accounts or piano contracts, credited a portion of the assumed proceeds from the new lot upon the balance due from the Maynard Company on account of an old lot which had matured. In either case a part of the original loan made by the Commonwealth Company to the Maynard Company entered into and formed a part of a subsequent loan, a portion of which still remains unpaid and secured by some one or more of the lots of accounts and piano contracts held by the Commonwealth Company or the Northern Trust Company when the May-

nard Company was adjudged a bankrupt. In *Cobe* v. *Guyer,* 237 Ill. 568, we said: "So long as any part of the original debt remains unpaid the debtor may insist upon the deduction of the usury, (*Payne* v. *Newcomb,* 100 Ill. 611; *Jenkins* v. *International Bank,* 97 id. 568; *House* v. *Davis,* 60 id. 367;) and only the balance of the principal remaining after the application on the principal of all payments, whether of principal or interest, can be recovered. (*Harris* v. *Bressler,* 119 Ill. 467.) No form which can be given to a contract, no device by which a new form is given to an old transaction tainted with usury, and no mere substitution of securities, will avail to cut off the defense of usury.—*Hunter* v. *Hatch,* 45 Ill. 178; *Nickerson* v. *Babcock,* 23 id. 561."

The Appellate Court did not err in directing the superior court, in determining the amount due from defendant in error to the Commonwealth Company, to ascertain the various sums loaned by the Commonwealth Company to the Maynard Company in the transactions which were not closed before the Maynard Company was adjudged a bankrupt, and to compute interest thereon at the legal rate of five per cent per annum for the periods during which the Maynard Company had the use of the respective sums. Those periods constitute the time from the making of each loan to its re-payment or the making of a sufficient tender of the amount due. The superior court, in stating the account, should treat each lot of accounts as a separate transaction, except where it appears that any given lot was carried over into a transaction involving a later lot, in which case the later lot should be considered as a continuation of the earlier transactions. In cases where no lots were so carried over, the settlement should be considered as a closed transaction and not subject to an accounting as to interest.

Section 11 of the Interest act provides that "no corporation shall hereafter interpose the defense of usury in any

action." Plaintiffs in error contend that because of this provision of our statutes defendant in error, as trustee in bankruptcy of a corporation, cannot raise the question of usury in this case. This contention is fully met by what was said in *Union Nat. Bank of Chicago* v. *Louisville, New Albany and Chicago Railway Co.* 145 Ill. 208. We there held that while a corporation cannot, on account of said section 11, insist upon the forfeiture of all interest, as provided by section 6 of the Interest act, where the debtor has, contracted to pay usurious interest, yet said section 11 does not prevent the debtor corporation from insisting that only interest at the legal rate shall be allowed in determining the amount due the creditor.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*