BRIERLEY et al. v. COMMERCIAL CREDIT CO.

No. 13362.

District Court, E. D. Pennsylvania.
Dec. 9, 1929.

Frank A. Harrigan, of Philadelphia, Pa., for plaintiff.

Thomas Stokes, of Philadelphia, Pa., Duane R. Dills, of New York City, Pepper, Bodine, Stokes & Schoch, of Philadelphia, Pa., and Dills & Towsley, of New York City, for defendant.

KIRKPATRICK, District Judge.

### Sur Pleadings and Proofs.

This is an action at law brought by the receivers in equity of William H. Lorimer's Sons Company (which will be referred to as Lorimer), plaintiffs, against the Commercial Credit Company (which will be referred to as the credit company), defendant, to recover the sum of $54,328.51, alleged to be usurious interest paid by Lorimer to the defendant in the course of business during the period from December 30, 1919, to August 18, 1927. The case tried to the court without a jury.

### Findings of fact.

1. Lorimer is a Pennsylvania corporation, and was during the years 1919–1927 engaged in the business of dyeing and mercerizing cotton yarns at Philadelphia, Pa. The defendant is a Delaware corporation with its principal office at Baltimore, Md.

2. The contract under which Lorimer paid to the defendant the sums of money which the receivers now seek to recover (which will be referred to as the covering contract) was signed by Lorimer at Philadelphia on December 23, 1919, and then transmitted by mail to Baltimore. After some delay it was accepted and signed by the credit company at Baltimore on December 30, 1919, and a duplicate of the original accepted copy was mailed by the credit company from Baltimore to Lorimer at Philadelphia. I find as a fact that the place of making the contract was Baltimore, Md.

3. The terms of the covering contract may be summarized as follows: (1) The credit company agreed to "buy" from Lorimer from time to time such accounts receivable belonging to Lorimer as might be acceptable to it, and to pay 77 per cent. of the gross face value of each account offered upon its acceptance, and the balance (less certain charges) upon payment to it in full of the accounts. (2) Although each account, together with all rights in connection with it, was to be assigned absolutely to the credit company at the time of its offer and acceptance, Lorimer, in order to avoid impairing

its standing with its customers, was given the right to receive at its office, remittances by debtors on the accounts, or, in other words, so far as the customer debtors was concerned, Lorimer would collect the accounts; no notice being given to them of their assignment. However, checks, drafts, notes, acceptances, and other evidence of payment received by Lorimer were to be indorsed and transmitted directly to the credit company, and Lorimer agreed that the credit company's auditors should have full access to its books, expenses of such examination to be paid by it. (3) Lorimer "warranted" that every debtor whose account might be offered would be solvent and generally that each account would be unincumbered, promptly paid when due, and collectible without loss or litigation. (4) The credit company agreed to perform certain services for Lorimer. These consisted of collecting, upon request, accounts direct from debtors; advising Lorimer as to the best method of keeping books, records, and accounts; placing its credit department at Lorimer's disposal and giving credit and financial advice upon request; and also furnishing the opinion of its legal department upon the form and legality of Lorimer's sales contracts. In addition to these services, the credit company agreed to accept at par subject to payment all remittances on accounts forwarded to it by Lorimer and to obtain forms proper for the assignment of the accounts. (5) The contract provided that for these services and also the inspection and audit of Lorimer's accounts (which latter it may be noted was not directly for Lorimer's benefit, but rather a condition upon which its right to collect direct from debtors depended) the credit company was to receive compensation fixed at $\frac{1}{30}$ of 1 per cent. of the gross value of accounts accepted by it, for each day from the date of acceptance until paid, plus $5 per thousand on the first $100,000 of such accounts. (6) Finally the parties agreed that the contract and all rights thereunder should be governed as to validity, enforcement, interpretation, construction, effect, and in all other respects by the laws of the state of Delaware.

4. I find as a fact that, with the exception of the periodical examination and audit of Lorimer's accounts, none of the services referred to were rendered by the credit company, that none were requested by Lorimer at any time, and that it was not contemplated by either party at the time the contract was entered into that such services would be required or rendered.

5. A detailed account of the manner in which the covering contract was performed appears in the stipulation of facts agreed to by the parties, and I find the facts to be as stipulated. The following general summary may be made: From day to day during the life of the agreement, Lorimer mailed, from Philadelphia to the credit company at Baltimore, schedules of accounts duly assigned, and the latter, having checked the credit risk of the debtor customers, would immediately mail its check for 77 per cent. of the face value of the accounts to Lorimer. When Lorimer received payments from its customers, it mailed each payment in its original form to the credit company, except when notes were received, in which case Lorimer sent its own check for the amount, together with the note, the note being thereafter returned to Lorimer as its property and collected by it. The credit company would indorse and deposit the checks thus received, and as soon as they had received the cash for the same, would remit to Lorimer the balance of the face value of the account not already advanced, or 23 per cent. Defendant's counsel in his brief states that from this remittance of 23 per cent. there was deducted in each case the credit company's charges. Apparently this is not disputed by counsel for the plaintiff, and, although it does not appear from the control sheets or portions of the credit company's accounts which were placed in evidence, I find it to be the fact, subject to correction on further proof or explanation, if it be material. At present it seems to be unimportant in just what manner the credit company collected its charges.

6. The money received by Lorimer was used in Pennsylvania. Lorimer performed in Pennsylvania its several obligations as to the manner of repayment, i. e., mailed bills to its customers, received their checks in payment, indorsed the same, and mailed them to the credit company at Baltimore. Where Lorimer's customers did not pay in cash but gave notes, Lorimer mailed the note with its check at Philadelphia, received the note back again at Philadelphia, and proceeded to collect it where payable. The mailing of the checks for advances to Lorimer and the depositing in the bank of the customers' checks received by the credit company in payment of the account took place in Maryland.

7. The total amount of charges received

or retained by the credit company under the provisions of the covering contract, from December 30, 1919, to August 16, 1927, on accounts assigned to it by Lorimer amounted to $80,645.35. If the transactions under the contract be considered loans to Lorimer by the credit company, then this amount is $54,328.31 in excess of interest at 6 per cent. on the balances due from Lorimer to the credit company.

8. On April 13, 1927, there were outstanding accounts receivable, previously assigned by Lorimer to the credit company, and unpaid by the debtor customers or by Lorimer, amounting in the aggregate to $20,890.25. All other accounts receivable assigned by Lorimer under the covering contract had been paid either by debtor customers or by Lorimer before that date. No accounts receivable were assigned by Lorimer to the credit company after March 10, 1927.

9. The plaintiffs, Brierley and Fleming, were appointed receivers of William H. Lorimer Sons Company by the United States District Court for the Eastern District of Pennsylvania March 18, 1927, and subsequent to their appointment made demand from the credit company for the amount of $54,328.51, which amount they alleged to be money collected as usury. The demand was refused. This suit was brought October 15, 1927.

### Discussion.

The plaintiff's position is that the transactions between Lorimer and the credit company under the covering contract were loans, that the rate of interest charged was usurious and unlawful, and that the interest paid may be recovered back.

The first question is as to the nature of the covering contract. The defendant contends that it is a sale and purchase of accounts. Certainly it is such in form. The plaintiff, however, says that the real nature of the transaction is a loan or loans of money secured by the assignment of accounts as collateral. The case of Root v. Republic Acceptance Corp., 279 Pa. 55, 123 A. 650, shows how far courts will go in totally disregarding the form of a transaction when it clearly appears that the parties intended something else. The defendant endeavors to distinguish the case of Commercial Security Co. v. Holcombe (C. C. A.) 262 F. 657, in which a somewhat similar transaction was held to be a loan, on the ground that in that case the borrower had the right to reacquire the paper (corresponding to the accounts in the instant case) by paying the amount called for with interest. I think, however, that the obligation to return or the right to reacquire the thing transferred or assigned is not nearly so essential an element where the subject-matter is a chose in action or a mere right to receive money as where it is a physical thing. Even in the instant case, as the contract was performed, Lorimer did in many instances reacquire accounts which had been assigned. I attach little importance to the fact that Lorimer's agreement that the accounts would be paid when due was called a warranty. The actual substantial result of it was that if an account for which it had received money was not paid at maturity it was bound to pay the money back and it could then proceed itself to collect the account. Lorimer got money from the credit company and was bound to see that money in the same amount was returned to the credit company when the accounts came due. What it paid for the accommodation of getting the money from the credit company, instead of having to wait to collect it from its customers, was really interest, though it was called by another name. The transaction is in substance a loan, and I so hold.

■ Whether or not the payments of interest alleged to be usurious may be recovered depends upon the state law covering the transaction. The next question therefore is: What law governs? The parties stipulated for the laws of Delaware, but that stipulation is ineffective because that place has no normal relation to the transaction. Seeman v. Philadelphia Warehouse Co., 274 U. S. 403, 47 S. Ct. 626, 71 L. Ed. 1123.

■ This leaves the contract as though no stipulation had been made, and in that situation the general rule is that the law of the place of performance, not the place of making the contract, controls. 12 Corpus Juris, 450; Scudder v. Union National Bank, 91 U. S. 406, 23 L. Ed. 245. There is, however, at least in the federal courts, a special rule applicable to contracts involving the payment of interest in which the question of usury arises. In such cases, if the interest allowed by the place of performance is higher than that permitted at the place of contract, the parties may stipulate for the higher interest, and, conversely, if the rate of interest be higher at the place of making the contract than at the place of performance, the parties may lawfully contract in that case also for the higher rate. Seeman v. Phila. Warehouse Co., 274 U. S. 403, 47 S. Ct. 626, 71 L. Ed. 1123; Bedford v. Eastern Building &

728

Loan Association, 181 U. S. 227, 242, 21 S. Ct. 597, 45 L. Ed. 834; Miller v. Tiffany, 1 Wall. 298, 17 L. Ed. 540.

In the instant case the contract was unquestionably executed in Maryland. The place of its performance is not so clear. In the case of a note, bond, or similar obligation evidencing an ordinary loan of money, the only thing left ordinarily by way of performance is the repayment of the money, and of course the place where the money is to be paid will be the place of performance of the contract. This contract, however, does not quite fall in the class of an ordinary loan. It will be noted that it does not evidence a direct advance of money contemporaneous with the making of the contract, but that it is a contract to loan money from time to time in the future upon the condition precedent that the security offered upon each occasion shall be satisfactory to the lender. Not only was no money loaned at the time, but there was no positive obligation to loan any money. If Lorimer had been unable to offer the credit company anything but worthless and unacceptable accounts, none would have been loaned. In addition, while whatever was to be loaned under the contract was to be repaid in Maryland, many important obligations of the parties under the contract were to be performed in Pennsylvania.

However, it seems to be unnecessary to decide which state was technically the place of performance of this contract. It is not seriously controverted that the stipulations of the parties as to interest would be lawful under the law of Maryland, and I so hold. This being the case, in a contract made in Maryland, to be performed partly in Maryland and partly in Pennsylvania, the parties certainly had the legal right to contract for a rate of interest which was lawful in Maryland. Even if the performance of the contract was to have taken place wholly in Pennsylvania, I think that it would have been competent to contract for interest according to the law of Maryland, the contract having been made there. Thus, in Cromwell v. County of Sac, 96 U. S. 51, 62, 24 L. Ed. 681, municipal bonds issued by a city in Iowa and deliverable in Iowa were expressly made payable at a bank in New York City. The question was as to the rate of interest after the maturity of the bonds. The stipulated rate prior to maturity was 10 per cent., lawful in Iowa but unlawful and usurious in New York. The Supreme Court, reversing the court below, held that the bonds were presumed to have been made with reference to the law of Iowa, that under that law the rate of ten per cent., being legal, applied after as well as before maturity, and that the usury statutes of New York state had no applicability. The court said: "When the rate of interest at the place of contract differs from the rate at the place of payment, the parties may contract for either rate, and the contract will govern."

What has been said makes it unnecessary for the purpose of this decision to determine whether, if this had been a Pennsylvania contract, it would have been lawful or unlawful under the Pennsylvania usury laws. If the highest rate which this corporation could have lawfully contracted for in Pennsylvania is 6 per cent., then, under the rule of the cases cited, the law of Maryland is to be applied, under which the usury laws are not in force as to corporations, and any rate of interest may be contracted for by them.

The effect of the decisions cited is to make it immaterial whether the contract was to be performed in Maryland or in Pennsylvania and I therefore do not decide that question. However, in order that my views upon all phases of the question may appear of record in the event of an appeal, it may be well to examine the question upon the assumption that the law of Pennsylvania governs.

The Act Pa. of May 28, 1858, P. L. 622 § 1 (41 PS § 3), fixes the lawful rate of interest in Pennsylvania at 6 per cent. Section 2 of that act (41 PS § 4) provides that when a higher rate shall have been contracted for, "the borrower or debtor shall not be required to pay to the creditor the excess over the legal rate, and it shall be lawful for such borrower or debtor, at his option, to retain and deduct such excess from the amount of any such debt; and in all cases where any borrower or debtor shall heretofore or hereafter have voluntarily paid the whole debt or sum loaned, together with interest exceeding the lawful rate, no action to recover back any such excess shall be sustained in any court of this commonwealth, unless the same shall have been commenced within six months from and after the time of such payment." The Act Pa. of April 27, 1927, P. L. 404 (41 PS § 2), provides "that no corporation shall hereafter plead or set up usury, or the taking of more than six per cent. interest, as a defense to any action brought against it to recover damages

on, or enforce payment of, or other remedy on, any mortgage, bond, note, or other obligation, executed or assumed by said corporation: Provided, That this act shall not apply to any action which is now pending." The plaintiffs contend that the act of 1858 gives the borrower two remedies: First, the right to withhold payment of the excess interest or to defend pro tanto in a suit to recover; second, where he shall have paid the full debt and usurious interest, the right to institute suit to recover it within six months. The act of 1927, the plaintiffs say, takes away from corporations only the right to defend, leaving them with the right to institute suit for the recovery of usurious interest where they have voluntarily paid it. It must be admitted that only a very liberal interpretation of the terms of the act of 1927 can avoid the force of this argument. However, the palpably unreasonable and anomalous situation which would arise under a literal interpretation of the act constrains me to hold that it should be given the broad construction. No sensible reason can be suggested why corporations should be permitted to recover back usurious interest which they have voluntarily paid and, at the same time, in cases where they have refused to pay it, be compelled to pay such interest in a suit by the lender to recover it. This view has been taken by other courts in a number of instances where similar statutes were involved. See Curtis v. Leavitt, 15 N. Y. 9, where the court (referring to a New York statute) said: "The effect of the act of 6th April, 1850, is to repeal the statute of usury so far as it applies to corporations. * * * The object of the act is to take away from corporate bodies the defense of usury—a defense which most men have come to regard as immoral, mischievous and unjust. It should have a liberal interpretation." See also Butterworth v. O'Brien, 23 N. Y. 275; Rosa v. Butterfield, 33 N. Y. 665; Carozza v. Federal Finance Co., 149 Md. 223, 131 A. 332, 43 A. L. R. 1. In Merchants Exchange National Bank v. Commercial Warehouse Co., 49 N. Y. 635, the court held that, while the primary or superficial meaning of the word "defense" was limited to the means by which a defendant prevents the success of the plaintiff's action, it will be interpreted, in construing a statute like that under consideration in this case, to mean "any position or attitude in an action in which a corporation seeks to avoid its own contract by showing that it is usurious." I assent to the views of the cases cited and hold that, under the Act of April

27, 1927, the plaintiffs cannot maintain this action.

The plaintiff, however, raises the question of the constitutionality of the act of 1927, and contends that it is invalid under the equal protection clause of the Fourteenth Amendment. The act effects a classification distinguishing corporations from individuals. The equal protection clause requires "that the classification be not arbitrary, but based on a real and substantial difference, having a reasonable relation to the subject of the particular legislation." Power Mfg. Co. v. Saunders, 274 U. S. 490, 493, 47 S. Ct. 678, 679, 71 L. Ed. 1165. The reasonableness of the classification effected by the statute is plain if consideration be given to the facts, first, that the purpose and object of the usury laws was the protection of debtors from the demands of creditors who have taken advantage of their temporary needs and that the hardship involved was particularly one of a personal nature; and, second, that the financial requirements of corporations, as business is conducted to-day, are, generally speaking, entirely different from those of individuals. So far from being an unreasonable classification, it would seem that uniform legislation for corporations and individuals in matters of this kind is arbitrary and unscientific.

Upon this phase of the question there is still to be considered the effect of the Act Pa. of May 8, 1929, No. 512 P. L. 1647 (41 PS § 2). This act re-enacts the Act of April 27, 1927, P. L. 404, with the added proviso that "this act shall not apply to * * * any suit or action instituted subsequent to the effective date of the act of April twenty-seventh, one thousand nine hundred and twenty-seven, upon any mortgage, bond, note or other obligation executed or assumed by said corporation prior to the effective date of the said act of April twenty-seventh, one thousand nine hundred and twenty-seven."

The proviso of the Act of May 8, 1929 clearly applies to the instant suit. It was instituted on October 15, 1927, upon a contract made December 30, 1919. Even if the loans under the covering contract be treated as separate contracts, most of them were made prior to the effective date of the act of April 27, 1927. But, in its application to the instant suit, I think that the act of 1929 violates the due process clause of the Fourteenth Amendment of the Constitution. On May 8, 1929, the credit company had received from Lorimer payments of money as interest

upon its loans amounting to approximately 18 per cent. This money had been paid under a contract which, both at the time of making and at the time of payment, was perfectly legal and valid in the state of Pennsylvania because Lorimer was a corporation and could contract for and pay interest at any rate it saw fit. If the act of 1929 were operative upon this contract, its effect would be to give Lorimer the right to recover a portion of these payments amounting to $54,328.51. While retrospective legislation is not unconstitutional as such, it may be so when it operates to deprive parties of property or vested rights. Koshkonong v. Burton, 104 U. S. 668, 26 L. Ed. 886.

Judgment may be entered for the defendant.