Roger BERGER, d/b/a Frontier Financial
Services, Appellant,

v.

STATE of Alaska, DEPARTMENT
OF REVENUE, Appellee.

No. S–6078.

Supreme Court of Alaska.

Jan. 26, 1996.

Mark A. Sandberg, Sandberg, Smith, Wuestenfeld & Corey, Anchorage, for Appellant.

Vincent L. Usera, Assistant Attorney General, Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

MATTHEWS, Justice.

## I. BACKGROUND

### A. Facts and Proceedings

In 1989, Roger Berger bought the rights to approximately 3000 permanent fund dividends (PFDs). He paid sellers between $325 and $400 for their PFDs.[1] To guarantee that he would receive the purchased PFDs, Berger had the sellers send the State a PFD change of address form with Berger's address on it and sign a power of attorney permitting Berger to cash the PFD check. In addition, each seller agreed to pay Berger the amount of the 1989 PFD if the State refused to honor the change of address request or the purchase. Finally, Berger had each seller sign a confession of judgment form so that he could collect the PFD amount from each seller if the State refused to honor the change of address request or the purchase.

Berger went to these lengths to guarantee collection because he knew that the Department of Revenue (DOR) did not favor PFD assignments. During the 1980s, DOR proposed regulations that would have prohibited PFD assignments. In each instance, the Attorney General advised DOR that the proposed regulation violated state law. Nonetheless, in 1989 a regulation was promulgated banning assignments "unless the assignee named is a government agency." 15 Alaska Administrative Code 23.220 (1989). Berger continued to purchase PFDs.

In October 1989, the sellers received a letter from DOR saying DOR would not honor the change of address forms and that DOR would mail PFDs to the sellers. In response, Berger filed suit, requesting damages, an injunction to force the State to honor the PFD assignments, and a declaratory judgment that the regulation barring PFD assignments is invalid.

The superior court denied injunctive relief, and this court denied Berger's petition for review. In 1991, the superior court found that the regulation was beyond the scope of DOR's authority and invalid.[2] Consequently, the superior court granted partial summary judgment for Berger. The court declined, however, to address whether the transactions were usurious, as claimed by DOR. In 1992, the superior court refused to grant either party summary judgment; it found that the State could not raise the defense of usury because the defense of usury is personal to a borrower, but found that the State could raise the Alaska Small Loans Act (ASLA) as a defense. Finally, in 1993, the superior court found that the PFD purchases were illegal and unenforceable under ASLA, and granted summary judgment for the State. Berger appeals.

### B. Usury and the Small Loan Laws

The American colonies adopted English usury laws prior to independence to limit the amount of interest a lender could charge on a loan. See generally Howard J. Alperin & Roland F. Chase, Consumer Law: Sales Practices and Credit Regulation § 497 (1986). While usury laws prevented one evil, they fostered another: loansharking. Usury interest limits were so low that small loans were not profitable. Many people needed to take out small loans, and turned to loansharks for small loans at illegal interest rates. Because these loans could not legally be enforced, lenders used extra-legal means

---

1. Each PFD was estimated to be worth $840, and turned out to be worth $873.16.

2. In 1992 the legislature amended AS 43.23.069(a) to prohibit PFD assignments. This amendment has no effect on the 1989 assignments.

for collection. 54 Am.Jur.2d *Moneylenders & Pawnbrokers* § 7 (1971); National Consumer Law Center, *Usury and Consumer Credit Regulation* §§ 2.3.3.1, 9.3.5.2 (1987).

In an attempt to curb the loanshark problem, legislatures began passing small loan acts in the early 1900s. These acts often were modeled after the Uniform Small Loan Law drafted by the Russell Sage Foundation. National Consumer Law Center, *supra*, §§ 2.3.3.1, 9.3.5.2. Small loan laws were special usury statutes, intended to be an exception to the general usury laws. Small loan laws primarily provided a licensing framework by which lenders could become licensed to offer small loans at interest rates higher than those allowed under general usury laws. These laws also prohibited unlicensed lenders from making small loans at rates higher than the general usury rates. Barbara A. Curran, *Trends in Consumer Credit Legislation* 15–45 (1965); F.B. Hubachek, *Small Loan Series: Annotations on Small Loan Laws—Based on the Sixth Draft of the Uniform Small Loan Law* (1938).

Alaska followed this general trend. Alaska's usury laws are codified at AS 45.45.010–.090. Under AS 45.45.010(a) the rate of interest is "10.5 percent a year and no more ... except as provided in (b) of this section." Subsection (b) provides that interest charged by express agreement may not exceed "five percentage points above the annual rate charged member banks for advances by the 12th Federal Reserve District" on the day the agreement is made, and that an agreement greater in amount than $25,000 "is

exempt from the limitation of this subsection."[3] Borrowers are provided with civil remedies if their lender charges too much interest. AS 45.45.010, .030. In 1955 the legislature passed the Alaska Small Loans Act, modeled after the sixth draft of the Uniform Small Loan Law.[4] Ch. 73 SLA 1955. ASLA describes the licensing process, AS 06.20.010–.220, and provided civil and criminal[5] penalties for both licensed and unlicensed lenders who violate its provisions. AS 06.20.320. ASLA also prohibits unlicensed lenders from lending less than $25,000 with interest higher than the legal rate. AS 06.20.300. It is this clause that the State claims Berger violated. However, before discussing whether Berger violated ASLA, we must first address whether the State can raise ASLA as a defense.

## II.  DISCUSSION

### A.  The State May Raise the Alaska Small Loans Act as a Defense [6]

Berger contends that the State cannot raise ASLA as a defense. Berger points out that ASLA is a form of usury statute. Traditionally, only borrowers (or their trustees) could raise usury as a defense. Because ASLA is a special usury statute, he argues that only the "borrower" (or, in this case, original PFD holder) can raise it as a defense.

The State addresses Berger's contention as a standing issue.[7] The State first points out that ASLA is not the State usury statute. And, contrary to the usury statute,

---

3. Subsection (b) was passed at a time when the rate it permitted was substantially higher than the 10.5 percent rate allowed under subsection (a). At this writing, however, the rate charged by the Federal Reserve is 5.25 percent and the permissible rate under subsection (b) is therefore 10.25 percent. This obviously paradoxical situation would appear to be worthy of legislative attention.

4. The legislative history does not state this, but the Uniform Small Loan Law and the original Alaska Small Loan Act are nearly identical. *Compare* Ch. 73 SLA 1955 *with* Hubachek, *supra*, at 181.

5. In 1993 the legislature repealed ASLA's criminal penalty provision. Ch. 26, § 102, SLA 1993.

6. Whether the State can raise ASLA as a defense is a question of law. We review questions of law using our independent judgment and apply the "rule of law which is most persuasive in light of precedent, policy and reason." *Summers v. Hagen*, 852 P.2d 1165, 1169 (Alaska 1993).

7. The State also argues that the doctrine of "estoppel" does not apply. Berger does not use the term estoppel, but claims that because the State did not raise ASLA until other claims failed, "the State's position is one of convenience rather than conviction." He does not cite any legal authority or explain why this is legally significant. Therefore, we do not address the estoppel argument. *Adamson v. University of Alaska*, 819 P.2d 886, 889 n. 3 (Alaska 1991).

ASLA had provisions for criminal enforcement by the Attorney General.[8] Additionally, the Attorney General has the power to intervene in cases in the public's interest. Since the Attorney General can affirmatively act to enforce ASLA, the State argues that he can raise ASLA as a defense.

■ The superior court found that the State had standing to raise ASLA as a defense:

> [ASLA] provides that violation of certain of its requirements ... constitutes a misdemeanor. This court agrees with the State's argument that if the attorney general has the power to bring an action to enforce a state law it must follow that the attorney general has standing to raise [a] violation of that statute in an action for damages against the state.

■ We agree with the superior court and the State. We have held that the State, through the Attorney General, can act to enforce certain statutes. For example, in *Public Defender Agency v. Superior Court,* 534 P.2d 947, 949–50 (Alaska 1975), we held that the Attorney General may enforce child support orders. The Attorney General's authority to enforce the support orders stems, in part, from the fact that "willful non-support [is] a misdemeanor." *Id.* at 949. Additionally, the Attorney General has the common law power "to bring any action which he thinks necessary to protect the public interest." *Id.* at 950. We reaffirmed *Public Defender Agency* in *State v. First National Bank of Anchorage,* 660 P.2d 406 (Alaska 1982). In *First National* the Attorney General brought suit against several fraudulent real estate developers. *Id.* at 408–09. The State sought an injunction against further fraudulent sales and restitution for fifty-three defrauded purchasers. *Id.* at 408. The developers argued "that the State was without authority to enforce the common law rights of these purchasers." *Id.* at 420. We held that the Attorney General could bring a

suit even "in the absence of express statutory authority." *Id.* at 421.

This case is similar to *Public Defender Agency.* The legislature has expressed an interest in protecting Alaskans from usurious small loans by making such transactions misdemeanors. Additionally, the State argues that invalidating the transactions is in the public interest. Thus, as in *Public Defender Agency,* we hold that the State can act to enforce a statute, in this case by raising ASLA as a defense to Berger's suit.

**B.** *The Alaska Small Loans Act Does Not Prohibit These Transactions* [9]

**1.** *The scope of the Alaska Small Loans Act.*

■ Alaska Statute 06.20.300(a) prohibits unlicensed persons from making small loans, or similar transactions, at a greater interest rate than that allowed under Alaska's general usury statute. The statute states:

> Except as authorized in this chapter, a person may not directly or indirectly charge, contract for, or receive any interest, discount, or consideration greater than that which the person would be permitted by law to charge if the person were not a licensee, upon the loan, use, or forbearance of money, goods, or things in action, or upon the loan, use, or sale of credit of the amount or value of $25,000 or less.

AS 06.20.300(a).

The superior court ruled that Berger violated the plain language of AS 06.20.300(a):

> [Berger] "contracted for" a "consideration" upon the "forbearance" of a "thing in action". The contract entered into between [Berger] and the individual applicant provided that [Berger] would receive consideration in the form of the applicant's 1989 Dividend (a "thing in action") or its cash equivalent. [Berger] would forbear the right to receive the Dividend or payment until January 1, 1990. Therefore, AS

---

**8.** Although the State speaks in the present tense, the legislature repealed ASLA's criminal penalty provision in 1993. Ch. 26, § 102, SLA 1993.

**9.** Whether ASLA applies to these transactions is a question of law. We review questions of law

using our independent judgment and apply the "rule of law which is most persuasive in light of precedent, policy and reason." *Summers v. Hagen,* 852 P.2d 1165, 1169 (Alaska 1993).

06.20.300 required that the consideration received by [Berger] in these transactions not be greater than authorized by law.

■ This misconstrues AS 06.20.300. Berger will receive a handsome return on his purchases. However, the statute only forbids handsome returns—those in excess of the legal rate—where there is (1) a loan/use/forbearance of money/goods/things in action, or (2) a loan/use/sale of credit.

■ In this case Berger relinquished money. Thus, AS 06.20.300 only prohibits the transaction if, when Berger paid each PFD seller, he was engaging in the loan or forbearance of money.[10]

■ It is clear that Berger did not engage in the forbearance of money;[11] whether he loaned money is less clear. There are two methods for determining whether Berger loaned money. First, did Berger's transactions fit the objective definition of a loan? Second, were the transactions loans disguised as sales? If the answer to either question is yes, Berger loaned money in violation of ASLA.[12]

2. *The transactions do not fit the definition of a loan.*

■ A loan is the payment of money by a lender to a borrower in exchange for an agreement to repay with or without interest. *See Southwest Concrete Prods. v. Gosh Constr. Corp.*, 51 Cal.3d 701, 274 Cal.Rptr. 404, 406, 798 P.2d 1247, 1249 (1990) ("A loan of money is the delivery of a sum of money to another under a contract to return at some future time an equivalent amount."); *Liberty Nat'l Bank & Trust Co. v. Travelers Indem. Co.*, 58 Misc.2d 443, 295 N.Y.S.2d 983, 986 (N.Y.1968) ("A loan is defined in Webster's New Twentieth Century Dictionary (1964) as

'. . . anything furnished for temporary use to a person at his request, on the condition that it shall be returned, or its equivalent in kind, with or without a compensation for its use. . . .'"); Consumer Credit Code (1974 Act) § 1.301(25)(a)(i) (defining loan as including "the creation of debt by the lender's payment of or agreement to pay money to the debtor or to a third person for the account of the debtor").

■ A sale is the payment of money by a buyer to a seller in exchange for title and possession of property. *See Cullen v. Bragg*, 180 Ga.App. 866, 350 S.E.2d 798, 799–800 (1986) (assignment of expected tax refund of $474 for immediate payment of $296.53 a sale rather than a loan); *Grinnell Corp. v. United States*, 390 F.2d 932, 947–48, 182 Ct.Cl. 702 (1968) (describing sale as, normally, transfer of property for a price); *Kline v. Robinson*, 83 Nev. 244, 428 P.2d 190, 194 (1967) ("A sale is the transfer of the property in a thing for a price in money. The transfer of the property in the thing sold for a price is the essence of the transaction."); U.C.C. § 2–106(1) (1987) ("A 'sale' consists in the passing of title from the seller to the buyer for a price.").

In this case, Berger gave each seller money in exchange for a PFD and a promise to repay Berger the value of the PFD if the State did not send Berger the proceeds. These transactions thus contain elements of both definitions but do not exactly fit either. The conditional guarantees add the element of possible repayment (found in a loan) to a transfer of property for money (a sale).

■ Case law holds that repayment guarantees do not necessarily turn sales into loans. Where such guarantees exist, however, transactions must be scrutinized to determine if they are disguised loans. *See Inves-*

---

**10.** We interpret the word "use," in this context, to be parallel and similar in meaning to the word "loan" and to apply when the subject matter is goods or things in action rather than money.

**11.** To forbear money is to refrain from collecting a debt. *See Boerner v. Colwell Co.*, 21 Cal.3d 37, 145 Cal.Rptr. 380, 384 n. 7, 577 P.2d 200, 204 n. 7 (1978) ("A 'forbearance' of money is the giving of further time for the repayment of an obligation or an agreement not to enforce a claim at its due date."); *H.V. Tygrett v. University Gardens Home-*

*owners' Ass'n*, 687 S.W.2d 481, 483 (Tex.App. 1985) ("'Forbearance' occurs when there is a debt due or to become due, and the parties agree to extend the time of its payment.").

**12.** The superior court analyzed the transactions to determine if they were disguised loans, but found that "it [was] not necessary to address this argument, given the fact that ASLA specifically covers the transactions."

*tors Thrift v. AMA Corp.*, 255 Cal.App.2d 205, 63 Cal.Rptr. 157, 159 (1967) ("[A] guarantee of the validity of accounts implemented by an agreement to repurchase 'uncollectible or dispute accounts' [does] not, per se, render the transaction a loan."); *Refinance Corp. v. Northern Lumber Sales*, 163 Cal. App.2d 73, 329 P.2d 109, 113 (1958) ("[T]he giving of a guaranty is simply an item of testimony or evidence which the trial court may consider in determining whether the transaction is in fact a loan. . . ."); *Webster v. Sterling Fin. Co.*, 355 Mo. 193, 195 S.W.2d 509, 515 (1946) ("[S]ome or all of the unsold installments in each note were pledged to secure the payment of the alleged sold installments, but we find no case or text that such would be evidence tending to show that the transactions were not sales, as stated in the sale agreements."); *Coast Fin. Corp. v. Ira F. Powers Furniture Co.*, 105 Or. 339, 209 P. 614, 615 (1922) ("The great weight of authority is that [a guaranteed] transaction should be regarded as a valid sale of a chattel with a warranty of soundness. . . ."); *Val Zimmermann Corp. v. Leffingwell*, 107 Wis.2d 86, 318 N.W.2d 781, 790 (1982) (When unsure if a guarantee makes a transaction a loan, "examine all of the allegations . . . to determine whether . . . [it is] a usurious loan."). Because the presence of the guarantees precludes finding that the transactions were by definition either loans or sales, we turn to the question of whether the transactions were disguised loans.

### 3. *The transactions are not disguised loans.*

▮ Courts often "pierce" suspicious commercial transactions to examine their true nature. *See, e.g., Milana v. Credit Discount Co.*, 27 Cal.2d 335, 163 P.2d 869, 871 (1945) ("The courts have been alert to pierce the veil of any plan designed to evade the usury law and in doing so to disregard the form and consider the substance."). *See generally* Hubachek, *supra*, at 145–78 (discussing small loan law evasion). Berger's transactions are sale-loan hybrids and should be subjected to the disguised loan analysis we articulated in two prior cases, *McGalliard v. Liberty Leasing Co.*, 534 P.2d 528 (Alaska 1975), and *Metcalf v. Bartrand*, 491 P.2d 747 (Alaska 1971).

We first addressed a disguised loan transaction in *Metcalf*. The transactions at issue began when Bartrand was denied a bank loan. *Id.* at 748. Her friend, Metcalf, offered to buy part of Bartrand's land for $3,500, but allow her to keep possession of the land. *Id.* at 748–49. In return, Bartrand agreed to buy the land back from Metcalf for $7,000 over three years. *Id.* When Bartrand later needed more money, Metcalf purchased another parcel of her land for $5,000 and she agreed to buy it back from him for $10,000 over two years. *Id.*

When Bartrand failed to keep up her purchase payments, Metcalf filed a foreclosure action claiming that Bartrand was in default on her contract payments. *Id.* Bartrand raised usury as a defense. *Id.* At trial, Metcalf testified that the transactions were sales and repurchases. *Id.* Bartrand testified that they were loans, and that she had intended to repay the money she had received. *Id.* The trial court found that the parties intended to make a loan, and that it was usurious and void. *Id.*

On appeal, we upheld the trial court's characterization of the transactions as disguised usurious loans. *Id.* at 750–51. We held that the court must look "not to the form but to the substance of the transactions." *Id.* at 751. We listed six factors for trial courts to consider in deciding whether a transaction is a disguised loan: (1) adequacy of consideration, (2) possession, (3) parties' conduct, (4) parties' financial status, (5) parties' expectations, and (6) accuracy of documents. *Id.* at 750. We also held that Bartrand did not have to prove mutual intent to disguise a loan. *Id.* at 750–51. We concluded that the evidence presented at trial, including Bartrand's testimony of her intent to repay the money she received, was sufficient to support the trial court's finding of a disguised usurious loan. *Id.*

Our second disguised loan case was *McGalliard v. Liberty Leasing Co.*, 534 P.2d 528 (Alaska 1975). The McGalliards desired to acquire trade fixtures. They selected what they wanted from a fixture supplier, Western Fixtures. It was arranged that

Liberty Leasing would pay $17,836.88 to Western for the fixtures and lease them to the McGalliards who would make thirty-six lease payments totalling $24,721.92 to Liberty. *Id.* at 529. At the end of three years, Liberty would extend the lease indefinitely for annual payments of $1,783.68. *Id.* After one extension Liberty would normally abandon leased property to its lessees. *Id.* at 532.

When the McGalliards defaulted after making nineteen payments, Liberty sued them for the balance of the lease. *Id.* at 529. The McGalliards raised usury as a defense. *Id.* The trial judge found that the usury statute did not cover the transaction and the McGalliards appealed. *Id.* In deciding *McGalliard,* we again listed several factors to consider in determining whether a transaction is a disguised loan: (1) the parties' intent, (2) the parties' discussion of alternatives, (3) the parties' relationship, (4) trade custom, (5) adequacy of consideration, and (6) computation of "charges in a manner in which loan interest is usually computed." *Id.* at 530. We found that there was substantial evidence that both parties intended to treat the transaction as a loan. *Id.* at 530–33. We reversed the trial judge and held that the "transaction was a third-party loan," *id.* at 533, that is a loan by Liberty, the proceeds of which were used by the McGalliards to buy fixtures from Western.

■ These cases seem to illustrate that one constant element of a loan is that the borrower has an expectation to repay the money advanced unconditionally, and not merely in default of some other occurrence.[13] *See McGalliard,* 534 P.2d at 530; *Metcalf,* 491 P.2d at 750; *see also Kline v. Robinson,* 83 Nev. 244, 428 P.2d 190, 194 (1967) (holding that a loan is the transfer of money under a contract to repay, "and if such be the intent of the parties the transaction will be deemed a loan regardless of its form"). In both *Metcalf* and *McGalliard* the borrowers intended to repay the entity which had advanced money, not only because there was a legal obligation to do so, but because that was in their economic interest at the time each transaction was entered into. *McGalliard,* 534 P.2d at 529–30; *Metcalf,* 491 P.2d at 749–50.[14]

In the present case, it is obvious from the structure of the questioned transactions that the PFD sellers did not have an unconditional repayment expectation, as distinct from knowledge that repayment might be forced upon them as a secondary remedy.[15] To cast the transactions in the present case in lender/borrower terms, forfeiture of the security (the PFD) is what the borrower intends and expects. Payment of the whole amount of the PFD to the lender (Berger), as distinct from allowing the forfeiture of the security, has no particular advantage from the borrower's standpoint because the security is the exact equivalent of the amount owed and is not independently useful to the borrower. These transactions thus lack an essential element of disguised loans and are therefore not forbidden by ASLA.

---

**13.** By contrast, the lender may not expect the borrower to repay the money advanced and, as in *Metcalf,* may hope that it is not repaid because the value of the security exceeds the amount owed. *Metcalf,* 491 P.2d at 749.

**14.** Repayment by the borrower in *Metcalf* was in the borrower's interest because the security was worth more than the amount owed. In the case of *McGalliard,* repayment was in the borrower's interest because the secured property was needed for the borrower's business.

**15.** In the accounts receivable financing cases cited by the dissent, the "seller" of the accounts receivable continued to collect the proceeds due under the accounts from the account debtors and forward them to the "buyer" of the accounts receivable. *Brierley v. Commercial Credit Co.,* 43 F.2d 724, 726 (E.D.Pa.1929); *Milana v. Credit Discount Co.,* 27 Cal.2d 335, 163 P.2d 869, 871 (1945); *Dorothy v. Commonwealth Commercial Co.,* 278 Ill. 629, 116 N.E. 143, 147 (1917); *Mercantile Trust Co. v. Kastor,* 273 Ill. 332, 112 N.E. 988, 989 (1916); *Western Auto Supply Co. v. Vick,* 303 N.C. 30, 277 S.E.2d 360, 366 (1981). Thus the "seller" expected to repay the buyer (by forwarding payments from account debtors) if the transaction proceeded as the seller expected that it would; the obligation to repay the buyer was thus not merely activated in default of receipt of payments by account debtors. Thus these cases are consistent with our decision in the present case. Further, unlike the present case, the accounts receivable financing cases involve continuing business relationships between the parties which are in substance indistinguishable from traditional lender/borrower roles.

### III. CONCLUSION

Because Berger did not loan or forbear money, ASLA does not cover his purchase of PFD rights, and the State cannot successfully raise ASLA as a defense to paying Berger. Therefore, we REVERSE the decision of the superior court and REMAND for proceedings consistent with this opinion.

COMPTON, Justice, with whom RABINOWITZ, Justice, joins, dissenting in part.

I conclude that the transactions at issue were disguised loans subject to the interest rate limitation of the Alaska Small Loans Act. Since the monetary return to Berger exceeded that limitation, the loan may not be enforced. AS 06.20.310. Thus, I dissent from Section II(B)(3) of the opinion.

The court concludes that the transactions were not disguised loans because the "sellers did not have an unconditional repayment expectation, as distinct from knowledge that repayment might be forced upon them as a secondary remedy." A fair reading of the record, however, reveals that the sellers *did* have an unconditional repayment expectation.[1] By signing the Purchase Agreement the sellers knew that there was no condition under which the money represented by the permanent fund dividend would not be paid to Berger. Furthermore, the sellers knew that they were ultimately responsible for this payment.

While the court minimizes the importance of the repayment guarantees, I consider them crucial to resolving the sale/loan question. An appropriate analogy, given the *sui generis* nature of permanent fund dividends, is to the sale of accounts receivable at a discount. Parties holding accounts receivable often sell them at less than their face value to obtain immediate cash in hand. If the seller of the accounts is "absolutely released from the obligations imposed by the instrument upon its discount and subsequent transfer," *Western Auto Supply Co. v. Vick*, 303 N.C. 30, 277 S.E.2d 360, 369 (1981), *aff'd on rehearing*, 304 N.C. 191, 283 S.E.2d 101 (1981), then the transfer is considered a true sale not subject to usury laws. *See Milana v. Credit Discount Co.*, 27 Cal.2d 335, 163 P.2d 869, 871 (1945) ("Contractors are free to buy and sell their property, and this may include promissory notes and other instruments, at a price agreed upon, and when the bona fides of the parties is established the percentage of profit has no relation to the usury law.").

Conversely, if the seller of the accounts remains ultimately responsible for repayment, by means of an endorsement or guarantee, then such transfers are considered loans subject to usury laws, regardless of how the parties describe the transaction. *See, e.g., Western Auto Supply*, 277 S.E.2d at 368 ("[I]f the purchaser of a note requires the endorsement of the seller as a guaranty of payment ... the transaction is, in effect, a loan."); *Dorothy v. Commonwealth Commercial Co.*, 278 Ill. 629, 116 N.E. 143 (1917) (a purported sale of discounted accounts receivable was actually a pledge of those accounts for a loan of money, due to the fact that the seller guaranteed payment of the accounts); *Mercantile Trust Co. v. Kastor*, 273 Ill. 332, 112 N.E. 988, 991 (1916) ("Calling the transaction a sale of accounts does not alter the fact that the transaction is merely an advancement of money, to be repaid by the borrower with a rate of interest greater than that allowed by law."); *Brierley v. Commercial Credit Co.*, 43 F.2d 724, 727 (E.D.Pa. 1929) ("[The seller] got money from the credit company and was bound to see that money in the same amount was returned to the credit company when the accounts came due. What it paid for the accommodation of getting the money from the credit company, instead of having to wait to collect it from its customers, was really interest, though it was

1. The "Purchase Agreement" provided,
   In the event that the Seller's Alaska Permanent Fund Dividend or cash equivalent thereof is not transferred to the Buyer by January 1, 1990, due to the Seller's failure to qualify for an Alaska Permanent Fund Dividend, non-delivery of the Alaska Permanent Fund Dividend to the Buyer, or a claim to the Seller's Alaska Permanent Fund Dividend paramount to the Buyer's then the Seller shall be in material breach of this agreement.
   This clause was followed by a confession of judgment.

called by another name."); *Milana v. Credit Discount Co.*, 163 P.2d at 872 ("The significant fact is that if the defendants had really purchased the accounts and had taken absolute title there would be no occasion for the provision or practice relating to guarantees of payment within specified periods....").

The distinction these cases draw between sales and loans, a distinction which focuses on the alleged seller's continuing obligations to the buyer, offers a more meaningful method of rooting out disguised loans than the rule established by the court today. I would apply this authority to the present case. By requiring permanent fund dividend "sellers" to guarantee repayment unconditionally, the Purchase Agreement "create[d] a debit and credit relationship which [was] not terminated until replacement of the sum borrowed with agreed interest." *Id.* at 871. In other words, the Purchase Agreement created a loan. I would so hold.