137 Nev., Advance Opinion **55**

IN THE SUPREME COURT OF THE STATE OF NEVADA

THE STATE OF NEVADA,
DEPARTMENT OF BUSINESS AND
INDUSTRY, FINANCIAL
INSTITUTIONS DIVISION,
Appellant,
vs.
TITLEMAX OF NEVADA, INC., A
DELAWARE CORPORATION,
Respondent.

No. 79224

FILED

SEP 23 2021

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a district court summary judgment in a declaratory relief action. Eighth Judicial District Court, Clark County; Jerry A. Wiese, Judge.

*Affirmed in part and reversed in part.*

Aaron D. Ford, Attorney General, Heidi J. Parry Stern, Solicitor General, David J. Pope, Chief Deputy Attorney General, and Vivienne Rakowsky, Deputy Attorney General, Carson City,
for Appellant.

Lewis Roca Rothgerber Christie LLP and Daniel F. Polsenberg, Joel D. Henriod, and Malani D. Kotchka-Alanes, Las Vegas,
for Respondent.

BEFORE THE SUPREME COURT, CADISH, PICKERING, and HERNDON, JJ.

21-27500

By the Court, PICKERING, J.:

NRS 604A.5065 to NRS 604A.5089 regulate title loans, a financial product for which a lender "[c]harges an annual percentage rate of more than 35 percent" and "[r]equires the customer to secure the loan" via title to their vehicle (excluding purchase-money security interests). NRS 604A.105. While NRS 604A.5074(1) generally limits the permissible duration of the original term of a title loan to 30 days, NRS 604A.5074(3) extends the permissible duration to "up to" 210 days, provided that the title loan meets the requirements delineated in that subsection; as relevant here, such loans (210-day title loans) cannot be subject to "any extension." NRS 604A.5074(3)(c) (the extension prohibition). NRS 604A.5076(1) (the FMV limitation) separately limits the permissible amount of any title loan to the "fair market value" of the securing vehicle.

With regard to these two limitations, in this appeal the Nevada Department of Business and Industry, Financial Institutions Division (FID) argues that (1) a refinance qualifies as a species of extension within the meaning of the extension prohibition and is therefore a prohibited practice for 210-day title loans; and (2) a lender must calculate interest and other costs and fees along with the principal loan amount into the FMV limitation for all title loans. FID asks that we reverse the district court's order granting summary judgment in favor of TitleMax and declaratory relief to the contrary. On the first point, we agree with FID—the unambiguous language of NRS 604A.065 (defining "extension") includes a refinance such that the extension prohibition reaches the practice at issue here. As to the second, we agree with TitleMax and the district court; the text of the FMV limitation demonstrates that only the principal loan amount is included as



part of that calculation. Accordingly, we affirm in part and reverse in part as follows.

## I.

Respondent TitleMax of Nevada, Inc., is a licensed lender offering title loans to its customers; appellant FID regulates that practice to ensure compliance with NRS Chapter 604A, including those sections laid out above. At issue in this appeal are TitleMax's 210-day title loans, on which interest accrues daily. Despite the extension prohibition in NRS 604A.5074(3)(c), TitleMax regularly offers borrowers on 210-day title loans the opportunity to "refinance," whereby the parties effectively agree to extend the period in which the title loan's principal amount is amortized for another 210 days in exchange for the borrower paying off the interest then owed. With regard to the FMV limitation, TitleMax limits the principal amount loaned to the fair market value of the vehicle in question, but it does not include the daily accruing interest or other associated fees and costs in the calculation of that upper limit.

In 2018, FID conducted an examination of TitleMax's practices and issued several Records of Examination (ROEs). As relevant to this appeal, the 2018 ROEs stated that (1) TitleMax's "refinances" were actually "extensions" that violated the extension prohibition, and (2) TitleMax had underwritten several loans that exceeded the fair market value of the securing vehicle because, as FID subsequently explained, FID believes TitleMax should account for "[t]he total amount the borrower must pay back includ[ing] the principal, interest, and fees" in the calculation. Based on these findings, FID issued TitleMax a "Needs Improvement" rating, meaning that TitleMax was subject to additional regulatory oversight and required to make changes to its practices to bring them into compliance with

the statutory requirements or else face liability and potential loss of its lender's license.

Rather than modifying its practices to conform with FID's demands, TitleMax sued in the Nevada district court, seeking declaratory relief from the findings of the 2018 ROEs, as well as temporary and permanent injunctive relief enjoining FID from imposing or seeking to impose discipline based on those alleged violations. As relevant here, TitleMax asked that the district court declare that (1) refinancing a title loan does not amount to a prohibited extension and (2) the FMV limitation refers only to the principal amount of the loan. FID moved for summary judgment, and TitleMax opposed and moved for summary judgment in its own right. The district court denied FID's motion for summary judgment and granted TitleMax's, as follows:

> This Court hereby finds, concludes, and declares, that TitleMax's practice of "refinancing" does not violate either NRS 604A.5074 or NRS 604A.065.

> This Court further finds, concludes, and declares, that the language of NRS 604A.5076 which refers to the "fair market value" of a vehicle, refers only to the principal amount of the loan, and does not include interest, fees, or other expenses or other recoverable amounts.

FID's appeal followed.

## II.

The district court's order granting summary judgment is subject to de novo review. *Wood v. Safeway, Inc.*, 121 Nev. 724, 729, 121 P.3d 1026, 1029 (2005). So too, the interpretation the district court gave to the various statutes at issue in reaching that result. *Zohar v. Zbiegien*, 130 Nev. 733, 737, 334 P.3d 402, 405 (2014). In this case, the language of those statutes is sufficiently plain to answer the questions FID's appeal poses.

*Wheble v. Eighth Judicial Dist. Court*, 128 Nev. 119, 122, 272 P.3d 134, 136 (2012) (stating that "[w]hen a statute is clear on its face, [this court] will not look beyond the statute's plain language").

A.

FID's first challenge is to the district court's determination that TitleMax's practice of offering its customers repeated opportunities to "refinance" violates the extension prohibition for 210-day title loans, as informed by the definition of "extension" found in NRS 604A.065. In full, NRS 604A.5074(3) provides,

> The original term of a title loan may be up to 210 days if:
>
> > (a) The loan provides for payments in installments;
> >
> > (b) The payments are calculated to ratably and fully amortize the entire amount of principal and interest payable on the loan;
> >
> > (c) *The loan is not subject to any extension*;
> >
> > (d) The loan does not require a balloon payment of any kind; and
> >
> > (e) The loan is not a deferred deposit loan.

(emphasis added). NRS 604A.065, somewhat circularly, defines an extension as "any *extension* or *rollover* of a loan beyond the date on which the loan is required to be paid in full under the original terms of the loan agreement, *regardless of the name given to the extension or rollover.*" (emphases added).

The ordinary meaning of an extension is "[a] period of additional time to take an action, make a decision, accept an offer, or complete a task." *Extension, Black's Law Dictionary* (11th ed. 2019); *see Lofthouse v. State*, 136 Nev. 378, 380, 467 P.3d 609, 611 (2020) (noting that the court gives statutory words their plain and ordinary meanings unless

SUPREME COURT
OF
NEVADA

(O) 1947A

5

the context requires a technical meaning or a different meaning is apparent from the context). TitleMax argues that, in a refinance, the first loan is paid off and second loan is made, such that the original loan term is not "extended." But when the same lender and the same borrower are involved, the principal is only given to the borrower once, at the inception of the original loan, and must be repaid when the refinanced loan's term expires. Thus, functionally, such a "refinancing" product offers customers who accept its terms a "period of additional time"—210 days from the day of "refinancing"—to pay TitleMax back the principal of the originally issued, later refinanced loan. Accordingly, "regardless of the name" TitleMax gives to this particular practice, in substance, based on the common understanding of the term, it appears to fall within NRS 604A.065 and, by reference, the extension prohibition.

But even setting this aside, under NRS 604A.065 a prohibited extension may also be a "rollover," which is "[t]he extension or renewal of a short term loan; *the refinancing* of a maturing loan or note." *Rollover*, *Black's Law Dictionary* (11th ed. 2019) (emphasis added). Accordingly, the parties' dispute over whether TitleMax's refinancing product was, in fact, a refinance is beside the point in any case. In this context, given the ordinary meaning of the statutory terms used, an extension is a rollover, and a rollover is a refinance; refinances are therefore a species of extension that fall within the extension prohibition. *See Bruce v. First Fed. Sav. & Loan Ass'n of Conroe, Inc.*, 837 F.2d 712, 719 (5th Cir. 1988) (holding, in the context of the former Thrift Institution Restructuring Act, that a lender's "offer to refinance the loan . . . may constitute an extension of credit"); *Cf.* Nathalie Martin & Ozymandias Adams, *Grand Theft Auto Loans: Repossession and Demographic Realities in Title Lending*, 77 Mo. L. Rev.

SUPREME COURT
OF
NEVADA

(O) 1947A

41, 74 (2012) (discussing practice of title loan extensions, rollovers, and refinancing as synonymous and collecting data from service providers).

Despite the seeming clarity of the language laid out above, TitleMax attempts to call this analysis into question. First, TitleMax points to graphics on a pamphlet offered to the Legislature by the assemblyperson who presented the bill that enacted NRS Chapter 604A and argues that the caption on those graphics demonstrates that a "rollover," as referenced in NRS 604A.065, is a very specific kind of financial product that meaningfully differs from a refinance. But even assuming that the pamphlet graphics imply what TitleMax says they do, any implicit suggestion drawn from the caption on a graphic on a pamphlet presented, at one point, to the Legislature cannot overcome the enacted text of the statute itself. *Wheble*, 128 Nev. at 122, 272 P.3d at 136. The Legislature could not have written NRS 604A.065 more expansively—an "[e]xtension" is "any extension or rollover" of a loan beyond its original due date, "regardless of the name [the lender gives] the extension or rollover."

TitleMax also suggests that treating a refinance as a type of extension renders certain language found elsewhere in NRS Chapter 604A superfluous. *See Buckwalter v. Eighth Judicial Dist. Court*, 126 Nev. 200, 202, 234 P.3d 920, 922 (2010) (noting that statutes should be construed together to avoid rendering any language superfluous). NRS 604A.5037, which regulates high-interest loans, is structured similarly to NRS 604A.5074. NRS 604A.5037(1) generally prohibits the original term of a high-interest loan from exceeding 35 days, though subsection (2) allows the original term to be for a longer period (90 days) if certain criteria are met, including—as with the limitations on title loans—that the high-interest loan does not allow for "any extension." According to TitleMax, if a

refinance is a type of prohibited extension, NRS 604A.5037(3), which separately prohibits the lender from "agree[ing] to establish or extend the period for the repayment, renewal, *refinancing* or consolidation of an outstanding high-interest loan for a period that exceeds 90 days after the date of the origination of the loan," would have no meaning. But this is not the case; NRS 604A.5037(3) limits the period of extensions for high-interest loans under NRS 604A.5037(1), not those that meet the heightened requirements of subsection (2), for which no extension is allowed in the first place. Put differently, a high-interest loan might fall under subsection (1), with, say, a 35-day original term and provisions that allow for an extension of that term; however, subsection (3) would *still* prohibit the lender from stretching that extension beyond 90 days from the date of the original loan. If anything, NRS 604A.5037(3)'s allowance of additional time via refinancing, so long as the total period does not exceed 90 days from the original date of the loan, confirms that in the Legislature's view a refinance is in fact a form of extension. Our reading of extension to include refinances as a subcategory does not violate the *Buckwalter* principle.

TitleMax relatedly argues that the Legislature's use of the word "refinancing" in NRS 604A.5037(3)—which express reference is also found in NRS 604A.501 (regulating deferred deposit loans)—means that it did not intend to include a refinance as a type of "extension" under NRS 604A.5074(3). But, as discussed, the plain meaning of an extension in this context broadly encompasses a refinance, among other types of loan renewals or agreements to extend the loan-term period; the reverse is not true. Accordingly, where the Legislature refers to "any extension" in NRS Chapter 604A, it is really saying "a refinance, among any other product with similar effect"; where, in contrast, the Legislature refers to "refinancing"

SUPREME COURT
OF
NEVADA

(O) 1947A

specifically, it is limitedly pointing to that financial practice in particular. Thus, TitleMax's citation in its favor of the principle that this court "presume[s] that the variation in language indicates a variation in meaning," *Williams v. State, Dep't of Corr.*, 133 Nev. 594, 598, 402 P.3d 1260, 1264 (2017), does not land—our understanding of extension as a top-line category of financial products, and refinances as a subvarietal thereof, still gives distinct meaning to each term.

Neither do the remainder of TitleMax's arguments on this point sway the outcome. Citing *Becerra v. Superior Court*, 240 Cal. Rptr. 3d 250, 265 (Ct. App. 2018), TitleMax argues that because "refinances" are not forbidden they are implicitly allowed; but, as established, refinances *are actually forbidden* as a species of extension. *See* NRS 604A.5074(3)(c). And, while TitleMax seems to claim that this interpretation would infringe upon its due process rights, the text itself plainly counsels this result; any claim of a failure of notice stemming therefrom thus necessarily fails. *Cf. Flamingo Paradise Gaming, LLC v. Chanos*, 125 Nev. 502, 514, 217 P.3d 546, 554 (2009) (holding that statute did not give notice of what conduct was prohibited because plain meaning of undefined terms could not be ascertained). Finally, while the parties dispute the proper application of the maxim *expressio unius est exclusio alterius* in this context, *see Horizons at Seven Hills Homeowners Ass'n v. Ikon Holdings, LLC*, 132 Nev. 362, 369, 373 P.3d 66, 71 (2016), this is beside the point—NRS 604A.065 defines "extension" functionally, "regardless of the name given to the extension," making the *expressio unius* canon inapposite. *See Arguello v. Sunset Station, Inc.*, 127 Nev. 365, 370, 252 P.3d 206, 209 (2011).

SUPREME COURT
OF
NEVADA

(0) 1947A

We therefore reverse the district court's order granting declaratory relief to the extent that it held that "TitleMax's practice of 'refinancing' does not violate either NRS 604A.5074 or NRS 604A.065."[1]

## B.

FID bases its second challenge on the latter part of the district court's declaratory judgment—that the FMV limitation refers only to the principal amount of the loan. In relevant part, NRS 604A.5076(1) provides, "A licensee who makes title loans shall not . . . [m]ake a title loan that exceeds the fair market value of the vehicle securing the title loan." Pursuant to NRS 604A.105,

> 1. "Title loan" means a loan made to a customer pursuant to a loan agreement which, under its original terms:
>
> (a) Charges an annual percentage rate of more than 35 percent; and
>
> (b) Requires the customer to secure the loan by either:
>
> (1) Giving possession of the title to a vehicle legally owned by the customer to the licensee or any agent, affiliate or subsidiary of the licensee; or
>
> (2) Perfecting a security interest in the vehicle by having the name of the licensee or any agent, affiliate or subsidiary of the licensee noted on the title as a lienholder.
>
> 2. The term does not include a loan which creates a purchase-money security interest in a vehicle or the refinancing of any such loan.

---

[1]With regard to the merits of TitleMax's motion to strike portions of FID's reply brief, it is unnecessary to address them—this decision is founded in the text of the relevant statutes, rather than any argument FID raises in reply. TitleMax's motion to strike is therefore denied.

NRS Chapter 604A's definition of "loan" is, again, unhelpfully circular, "referring the reader [back] to" the definitions of the products regulated by the chapter. *State, Dep't of Bus. & Indus., Fin. Insts. Div. v. Check City P'ship, LLC*, 130 Nev. 909, 913, 337 P.3d 755, 758 (2014); *see also* NRS 604A.080. But the ordinary meaning of the term, as relevant here, is "a sum of money lent at interest," not the sum of money lent *and* the interest. *Loan, Black's Law Dictionary* (11th ed. 2019); *see also Check City*, 130 Nev. at 913, 337 P.3d at 758 (recognizing that the "usual and natural reading" of the term is the principal amount borrowed before applying different statutory definition). Indeed, like Nevada, many other states similarly regulate the practice of title loans, and definitions in these foreign statutes further support this common understanding of the term. *See* Mark S. Edelman, Robert A. Aitken, Raechelle C. Yballe, *The Road Ahead: Emerging Trends in Personal Property Finance*, 63 Bus. Law. 597, 598 (2008) (collecting statutes treating the principal amount of a loan as distinct from interest); *see also* Unif. Consumer Credit Code § 1.301(25)(a)(i), 7 U.L.A. 126 (2002) (defining "loan" as "the creation of [a] debt"); Fla. Stat. Ann. § 537.003 (West 2013) (defining a title loan as "a loan of money to a consumer" secured by a vehicle title and separately defining "[i]nterest" as the cost of obtaining a title loan); Ill. Admin. Code tit. 38, § 110.300 (separating the terms "loan" and "interest . . . charged [thereon]" in the definition of title loan); *Berger v. State, Dep't of Revenue*, 910 P.2d 581, 586 (Alaska 1996) (defining a loan, for the purposes of the Alaska Small Loans Act, as "the payment of money by a lender to a borrower in exchange for an agreement to repay with or without interest").

As FID recognizes, this court departed from the ordinary meaning of "loan" in *Check City*—which examined the limitations on

another financial product regulated by NRS Chapter 604A, deferred deposit loans—by holding that interest and other fees had to be included in the calculation of the permissible upper limit of such a loan. 130 Nev. at 912, 337 P.3d at 757 (interpreting NRS 604A.425, recodified with amendment as NRS 604A.5017, which provided, "A licensee shall not . . . [m]ake *a deferred deposit loan* that exceeds 25 percent of the expected gross monthly income of the customer when the loan is made"). But this court did so because NRS 604A.050 defined a deferred deposit loan as "a transaction," such that it was clear that "the principal amount borrowed is merely one aspect of the larger transaction" at play in the deferred deposit loan context. *Check City*, 130 Nev. at 912, 337 P.3d at 757. In contrast, with regard to title loans (and high-interest loans), the Legislature straightforwardly phrased the products' definitions in terms of types of "loan[s]" rather than "transaction[s]," such that there is no reason to deviate from what this court previously recognized is the ordinary meaning of the relevant term. *See* NRS 604A.065; NRS 604A.0703 (defining a high-interest loan as "a loan made to a customer pursuant to a loan agreement which, under its original terms, charges an annual percentage rate of more than 40 percent").

Moreover, contrary to FID's claims that reaching a result inapposite from *Check City* would be "nonsensical" here, it actually makes pragmatic and policy sense for the Legislature to have regulated deferred deposit loans differently than either title loans or high-interest loans. As this court recognized in *Check City*, deferred deposit loans are unusual because the whole cost of the "transaction"—including interest—is included upfront in the check the borrower gives the lender; that is, at the outset, "a deferred deposit loan transaction encompasses more than simply the amount borrowed but also includes some consideration to the lender beyond



the customer's promise to repay the amount borrowed." 130 Nev. at 913, 337 P.3d at 757. In terms of the workability of the rule, given that the total cost to the borrower is readily discernable at the time the lender accepts the post-dated check, the reference to the "transaction" and the inclusion of interest and other fees therein makes sense. Not so in the title loan context, where interest accrues daily and can typically only be determined *post hoc*, when the loan is finally paid off.

Policy reasons further support the distinction. In contrast to a deferred deposit loan, a title loan is nonrecourse, meaning that the lender's recovery will ultimately be limited to the value of the vehicle that secures its loan. *Compare* NRS 604A.503 (providing that deferred deposit lender may recover total amount of principal owed plus unpaid interest), *with* NRS 604A.5078 (providing that "the sole remedy of the licensee who made the title loan is to seek repossession and sale of the vehicle which the customer used to secure the title loan"); *see also* Jim Hawkins, *Regulating on the Fringe: Reexamining the Link Between Fringe Banking and Financial Distress*, 86 Ind. L.J. 1361, 1392 (2011) (noting that in the context of title loans, as opposed to other "fringe" banking products, "consumers have a safety hatch they can use if they cannot pay off the loan—they can walk away with the money and lose their vehicle"). Thus, a title loan lender does not have the same incentive to inflate the total amount of a loan and interest as does a deferred deposit lender, and a borrower is less likely to fall into a cycle of unmanageable debt as a result of the former. *See* Hawkins, 86 Ind. L.J. at 1393 (concluding that title loan lenders "have structured the transaction to prevent the total financial breakdown of the people who use them"). The Legislature therefore could have feasibly determined that the interest charged on deferred deposit loans needed to be more tightly

regulated. *See State, Dep't of Bus. & Indus., Fin. Insts. Div. v. Dollar Loan Ctr., LLC*, 134 Nev. 112, 112, 412 P.3d 30, 32 (2018) (noting that in enacting NRS Chapter 604A the Legislature was "[r]esponding to a so-called 'debt treadmill'").[2]

Further, while FID relies heavily on the policy underlying NRS Chapter 604A in support of its interpretation of the FMV limitation, *see id.*, 134 Nev. at 115, 412 P.3d at 34 (suggesting that NRS Chapter 604A has a protective purpose), scholars who study these types of financial products have argued that laws capping the amount of a title loan based on the value of the securing vehicle should actually "aim to incentivize lenders to loan the *highest percentage* of the vehicle's value possible because then borrowers who lose a vehicle will lose the least amount of their equity." Jim Hawkins, *Credit on Wheels: The Law and Business of Auto-Title Lending*, 69 Wash. & Lee L. Rev. 535, 601 (2012) (emphasis added). This means that FID's favored interpretation of the FMV limitation may actually undercut the very policy it seeks to promote. Accordingly, to the extent that policy considerations were even pertinent to our interpretation of the FMV limitation, those considerations do not clearly counsel in favor of our sidestepping the plain meaning laid out above and rolling the interest charged on a loan into the FMV limitation. *Lofthouse*, 136 Nev. at 380, 467 P.3d at 611.

---

[2]This is not to minimize the potential detrimental effect of losing one's vehicle after making repeated payments on an over-secured loan, *see, e.g.*, Jessie Lundberg, *Big Interest Rates Under the Big Sky: The Case for Payday and Title Lending Reform in Montana*, 68 Mont. L. Rev. 181, 191 (2007) (arguing that "[t]itle loans can be every bit as disastrous as payday loans"), but to illuminate a potential rationale for regulating other types of consumer financial products even more aggressively.

## III.

In sum, we conclude that (1) the extension prohibition on 210-day title loans includes refinances as a species of extension based on the plain language of NRS 604A.065 and (2) the FMV limitation only refers to the principal amount of the loan. We therefore reverse in part and affirm in part the district court's order granting summary judgment and declaratory relief in TitleMax's favor.

_____, J.
Pickering

We concur:

_____, J.
Cadish

_____, J.
Herndon